## CIRCUIT COURT OF FAIRFAX COUNTY

In re July 31, 2013,
Decision of the
Board of Zoning Appeals
of Fairfax County
Denying Application of
New Cingular Wireless PCS, L.L.C.,
and the Parklawn Recreation
Association, Inc.,
for an Amendment to
Special Permit 76-M-088
(SPA 76-M-088)

May 7, 2014

Case No. CL-2013-13733

BY JUDGE RANDY I. BELLOWS

Before the Court is Petitioner New Cingular Wireless, L.L.C., d/b/a AT&T Mobility's ("AT&T" or "Petitioner") appeal from the July 31, 2013, decision of the Board of Zoning Appeals of Fairfax County ("BZA"). Both the Original and Amended Petitions for Writ of Certiorari state that AT&T is the Petitioner in this case and that Mr. Donohue is counsel for AT&T. However, Mr. Donohue also represents the Parklawn Recreation Association ("Parklawn") in this matter. Although AT&T and Parklawn submitted a joint application to the BZA, the Court will treat AT&T as the Petitioner in this matter because the Petition only states that AT&T is the Petitioner.

On March 6, 2014, the parties presented arguments, and the Court took the matter under advisement. After considering the arguments of both parties, the Amended Petition for Writ of Certiorari and the evidence in the record and, for the reasons discussed below, the Court affirms the decision of the BZA.

*Introduction*

## I. *Procedural History*

Petitioner New Cingular Wireless, L.L.C., is a limited liability company that provides wireless telecommunications services throughout Virginia and the United States. Am. Pet. for Writ of Cert. ("Pet.") 5. The Parklawn Recreation Association, Inc. ("Parklawn") is the owner of the property that is the subject of the BZA's decision in this case. Pet. 5. On June 8, 1976, the BZA approved special permit application ("SPA") 76-M-088, which allowed Parklawn to operate a community recreation facility on the subject property that included a community pool, tennis courts, a bath house, a multi-purpose court, and a children's play area. R. at 294. As discussed below in Part II.B, any modification to a special permit use requires approval of the BZA. In the light of AT&T's alleged wireless coverage gaps in the area along State Route 613 in the Lincolnia Heights and Parklawn neighborhoods of Alexandria, Virginia, AT&T sought to construct a facility to remedy these gaps. Pet. 7. AT&T entered into a lease agreement with Parklawn to construct the facility on its property. R. at 35. Thus, on January 15, 2012, AT&T and Parklawn jointly filed an application with the BZA to amend SPA 76-M-088 to permit the construction of a mobile and land-based telecommunications facility, specifically a 128-foot stealth monopine (a treepole with faux brown bark and faux green branches to conceal the antenna) and ancillary 1,040 square foot equipment compound, on Parklawn's property. Pet. 7-8; R. at 1322.

AT&T and Parklawn's application was sent to the Staff at the Department of Planning and Zoning ("Staff"), who reviewed the application, requested additional information, and suggested various changes. Pet. 8-9; R. at 268-307. Staff performed a "2232 analysis" in accordance with Va. Code § 15.2-2232 in order to make a recommendation to both the BZA and the Fairfax County Planning Commission (who subsequently makes a recommendation to the Board of Supervisors for a Special Exception Application) as to whether the application complied with the Fairfax County Comprehensive Plan. R. at 298, 306, 459.

> § 15.2-2232. *Legal status of plan.* A. Whenever a local planning commission recommends a comprehensive plan or part thereof for the locality and such plan has been approved and adopted by the governing body, it shall control the

general or approximate location, character, and extent of each feature shown on the plan. *Thereafter, unless a feature is already shown on the adopted master plan or part thereof or is deemed so under subsection D, no* street or connection to an existing street, park or other public area, public building or *public structure, public utility facility or public service corporation facility* . . . whether publicly or privately owned, *shall be constructed, established, or authorized, unless and until the general location or approximate location, character, and extent thereof has been submitted to and approved by the commission as being substantially in accord with the adopted comprehensive plan or part thereof.* In connection with any such determination, the commission may, and at the direction of the governing body shall, hold a public hearing, after notice as required by § 15.2-2204.

B. The commission shall communicate its findings to the governing body, indicating its approval or disapproval with written reasons therefor. The governing body may overrule the action of the commission by a vote of a majority of its membership. Failure of the commission to act within 60 days of a submission, unless the time is extended by the governing body, shall be deemed approval. The owner or owners or their agents may appeal the decision of the commission to the governing body within 10 days after the decision of the commission. The appeal shall be by written petition to the governing body setting forth the reasons for the appeal. The appeal shall be heard and determined within 60 days from its filing. A majority vote of the governing body shall overrule the commission . . . .

§ 15.2-2232 (emphasis added).

Specifically, Staff suggested that AT&T submit a monopole design with a graduated paint scheme in addition to the monopine design. Pet. 9; R. at 299-300. AT&T complied with this request and revised its application to include a second design, a monopole painted brown to the height of the surrounding treeline and then light blue to match the sky. Pet. 8-9, 15; R. at 1322; R. at 368. After the submission of various other materials, including information on alternative sites considered by AT&T and additional photographic simulations of design options, the Staff issued a report on May 29, 2013, recommending that the BZA approve AT&T's application subject to the proposed development conditions submitted by AT&T and reviewed by Staff. Pet. 9; R. at 351-438; R. at 306.

On July 17, 2013, the BZA held a public hearing on AT&T's application and deferred decision until a July 31, 2013, hearing. R. at 1397-1437. Prior to this hearing, the BZA had received extensive filings from individuals and organizations supporting and opposing AT&T's petition, including petitions in support and opposition, letters in support and opposition, and numerous memoranda. See, e.g., R. at 599-1140. At the July 17th hearing, AT&T presented its proposal to the BZA, and the BZA heard testimony in support of and in opposition to the application. R. at 1401-17. On July 31, 2013, the BZA discussed AT&T's proposal and denied its application for an amendment to SPA 76-M-088. R. at 1437. On August 7, 2013, the BZA issued a written decision containing its reasons for denying AT&T's application. R. at 1339-42.

On August 29, 2013, AT&T petitioned this Court for Writ of Certiorari to appeal the BZA's decision. See Pet. for Writ of Cert. ("Original Pet."). This Court granted the writ on October 4, 2013, and ordered the BZA to make a return of the record within thirty days. Also on October 4, 2013, the Court granted Petitioner leave to amend its petition. In addition to supplementing its arguments, the Petitioner added information regarding the Board of Supervisors' approval of AT&T's special exception application. Compare Original Pet. 10-11 with Pet. 11-12. As explained below, AT&T required both a special permit amendment, subject to the approval of the BZA, and a special exception, subject to the approval of the Board of Supervisors, in order to build its proposed facility. At the time the Original Petition was filed, the Board of Supervisors had not yet granted Petitioner's special exception. Original Pet. 7, n. 1. The Board of Supervisor's decision is not before the Court; the Court is solely reviewing the BZA's decision on AT&T's special permit application.

Counsel for the Board of Supervisors, the party of interest in an appeal of a BZA decision under Va. Code § 15.2-2314, answered the amended petition on October 7, 2013.

Va. Code § 15.2-2314 dictates that the BZA is not a proper party to an appeal from its decision, but rather, that only the "governing body, the landowner, and the applicant before the board of zoning appeals shall be necessary parties to the proceedings." The County Attorney's Office emphasized in its answer that it was *not* counsel for the BZA and only represented the Board of Supervisors.

The answer did not ask the Court to affirm or reverse the BZA's decision; it only asked the Court to refrain from entering any orders adverse to the Board of Supervisors.

On November 1, 2013, Mr. William M. Baskin, Jr., Esq. filed a motion to intervene on behalf of Parklawn Recreation Association members and/or owners of property adjacent to the proposed facility site. The motion asserted that Mr. Baskin's clients stand to be aggrieved by a reversal of the BZA decision and should thus be entitled to intervene in the proceedings. Mot.

to Intervene 1. Mr. Baskin argued that, because the Board of Supervisors was not asking the Court to uphold the BZA's decision in this case, there was no one to present arguments on behalf of the BZA. *Id.* at 1-2. Hence, intervention was necessary in order to ensure complete justice was done in this case. *Id.* at 2, 5. Both AT&T and the Board of Supervisors opposed the motion to intervene, arguing that intervention was not proper because Mr. Baskin's clients were not "aggrieved" by the BZA's decision, a requirement mandated by Va. Code § 15.2-2314. See Va. Code § 15.2-2314 ("The court may permit intervention by any other person or persons jointly or severally aggrieved by any decision of the board of zoning appeals."); see also Board of Supervisors' Mem. of P. & A. Regarding Mot. to Intervene 4; Pet'r's Opp. to Mot. to Intervene 2-3. After considering the arguments of the parties, Judge Robert J. Smith of this Court denied Mr. Baskin's motion to intervene on November 21, 2013.

After the denial of the motion to intervene, the case was assigned to this Court for trial. On March 6, 2014, the Court heard argument by counsel for AT&T and counsel for the Board of Supervisors in a bench trial and took the matter under advisement. Subsequently, on March 10, 2014, Mr. Baskin submitted a letter to the Court regarding the denial of his Motion to Intervene. The Court treated this letter as a Motion to Reconsider the denial of the Motion to Intervene, permitted and received written responses from AT&T and the Board of Supervisors on the matter, and resolved the issue on the papers. On March 24, 2014, the Court entered an order denying Mr. Baskin's Motion to Reconsider because it found that the language in § 15.2-2314 was controlling and dispositive of the issue. Thus, the Court concluded, intervention was not proper because Mr. Baskin's clients were not "aggrieved" by the BZA's decision.

The Court also took under advisement the question of whether to permit Mr. Baskin's clients to participate as *amici curiae*. In light of the resolution of this matter, the Court need not resolve the issue.

## II. *Decision of the Board of Zoning Appeals*

### A. *Decision*

The BZA's decision regarding AT&T's special permit application is included verbatim below:

County of Fairfax, Virginia,
Special Permit Resolution
of the Board of Zoning Appeals

THE PARKLAWN RECREATION ASSOCIATION, INC., & NEW CINGULAR WIRELESS PCS, L.L.C., SPA 76-M-088 Appl. under

Sect(s). 3-303 and 3-304 of the Zoning Ordinance to amend SP 76-M-088 previously approved for a community swim club to permit construction of a wireless telecommunications facility. Located at 6011 Crater Pl., Alexandria, 22312, on approx. 14.54 ac. of land zoned R-3. Mason District. Tax Map 61-4 ((6)) (T) 056 and 72-2 ((3)) (T) C. (Indefinitely deferred from 4/14/10 at appl. req.) (Reactivated on 5/11/12) (Admin. moved from 10/17/12, 12/12/12, 1/16/13, 3/6/13, 5/8/13, and 7/10/13 at appl. req.) (Decision deferred from 7/17/13.) Mr. Byers moved that the Board of Zoning Appeals adopt the following resolution:

Whereas, the captioned application has been properly filed in accordance with the requirements of all applicable State and County Codes and with the by-laws of the Fairfax County Board of Zoning Appeals; and

Whereas, following proper notice to the public, a public hearing was held by the Board on July 31, 2013; and

Whereas, the Board has made the following findings of fact:

1. The applicant is the owner of the land.

2. The present zoning is R-3.

3. The area of the lot is 14.53 [sic] acres.

4. Staff has recommended approval, but in this instance, the Board does not agree with that recommendation.

5. The Board does not agree that it is in conformance with the Comprehensive Plan.

6. As noted in the public hearing, the Board has one responsibility, and that is to determine if this application meets Zoning Ordinance criteria under Sect. 8-006 of the Zoning Ordinance.

7. In the Board's view, this application does not meet Standards 1, 2 or 3.

8. Standard 1, the proposed use of the specified location shall be in harmony with the adopted comprehensive plan.

A. A key concept in assessing telecommunications facilities is mitigation, which is defined as actions taken to reduce or eliminate negative visual impacts.

B. On page 6 of the staff report, the 2232 analysis, plan guidelines support the location of telecommunication uses on existing private recreation in a predominately residential area when other more suitable land uses, such as public property or commercial or industrial properties, are not available and the telecommunications facility is located to blend into its surroundings.

C. In the staff report itself, quote, the proposed installation will result in visual impacts that may not be fully mitigated for some of the surrounding properties.

D. On page 8 of the staff report, quote, while the monopole has a clear impact to some adjacent properties, the visual impact to the overwhelming majority of the surrounding properties is reasonably mitigated, unquote. Quote, staff concludes the monopole, with a graduated paint, blends better in the areas where the pole extends above the tree line, although it is not necessarily a quote, stealth design, unquote.

9. The mere fact that there have been several unsuccessful attempts over the past several years beginning in 2007 by another telecommunications carrier to locate a telecommunications facility on this particular property should give us all pause.

10. Whether it is a monopole that purports to blend into the sky or not, it is going to extend 50 to 75 feet above the tree line.

11. The trees in this area are deciduous. They are not pine and are going to be barren of leaves for a significant portion of the year, meaning residents immediately adjacent to the monopole will have a direct view of that monopole.

12. Standard 2, the proposed use will be in harmony with the general purpose and intent of applicable zoning district regulations.

A. The site as contemplated is not compatible with the residentially zoned land based on the information provided in the staff report, at least as the Board interpreted it, and the testimony given during the public hearing.

B. Although the site itself is 14.53 [sic] acres, much of the parcel is not useable as it is in a resource protection area and flood plain.

C. This has resulted in the tower being placed only 226 feet from the nearest residence.

D. It is not the number of acres that counts. It is where the monopole is placed on that acreage and the mitigation techniques used that are paramount.

E. In other applications approved by the Board, the placement of the pole has been mitigated by it being a flagpole, a cross, or being placed in the steeple of a church.

F. The Board has also approved monopoles on recreation sites that are surrounded by pine trees and have been able to mitigate the effects by using a monopine.

G. None of those mitigation techniques can or have been used in this case.

13. Standard 3, the proposed use shall be such that it will be harmonious with and will not adversely affect the use or development of neighboring properties in accordance with the applicable zoning district regulations and the adopted Comprehensive Plan. The location, size, and height of building structures, walls, fences, and the nature and extent of screening, buffering, and landscape shall be such that the use will not hinder or discourage the appropriate development use of adjacent or nearby land or buildings or impair the value thereof.

A. Reading the analysis in the Thorne Evaluation study, of the six sites that were analyzed, five were in the State of Maryland. There would have been much more relevance if the studies had concentrated on value patterns in Fairfax County.

B. The Board agrees with Thorne that some of the primary reasons an individual purchases a home are good schools, the neighborhood, and transportation. Although these may be the primary reason, a simpler test would be viewing two homes of exactly the same value, with exactly the same access to good schools, and exactly the same access to the same transportation and having the opportunity to buy one without a monopole that is 128 feet tall that is in the backyard or one that does not have a monopole and has open vistas, which home would be purchased? The home without the monopole.

C. This leads to two alternatives that any homeowner has in that situation. You either decrease the value of your property to bring it in line so people will purchase your home

or your home stays on the market for a longer period of time. That decreases the value of your home.

14. It is also noted that of the 158 members of the Parklawn Recreation Association, 70 percent do not reside in the neighborhood and, therefore, would have no issue with a monopole.

15. Also noted, based on the petition that was circulated, just about everyone in the community is dead set against this monopole.

16. There are other technologies available, and they were never presented to the Board.

17. With any applicant, cost could be a factor, but the Board was never apprised of the reasons other techniques were not employed or other locations whereby the applicants' coverage concerns could be met fully and would truly mitigate the effects of the equipment used.

And whereas the Board of Zoning Appeals has reached the following conclusions of law:

That the applicant has not presented testimony indicating compliance with the general standards for Special Permit Uses as set forth in Sect. 8-006 and the additional standards for this use as contained in the Zoning Ordinance,

Now, therefore, be it resolved that the subject application is denied.

Ms. Gibb seconded the motion, which carried by a vote of 6 to 0 to 1. Mr. Hart moved to waive the twelve-month waiting period for refiling an application. Mr. Beard seconded the motion, which carried by a vote of 4 to 2 to 1. Mr. Hammack abstained from the votes.

B. *Standards Used by the BZA*

Under Va. Code § 15.2-2309(6), it is the duty of the BZA to "hear and decide applications for special exceptions as may be authorized in the ordinance." Section 15.2-2309(6) thus directs the Court to look at the Fairfax County Zoning Ordinance ("Ordinance") to determine the procedure and standards governing the BZA's decision to grant or deny a special exception. Although the Virginia Code refers to the BZA's duty to hear and decide "special exceptions," the Ordinance makes clear that the Fairfax County BZA hears special permit applications, while the Board of

Supervisors hears special exception applications. See Zoning Ordinance of Fairfax County, Virginia ("Ordinance") §§ 2-303, 2-304 (2014) (mandating that special permit uses are approved by the BZA, while special exception uses are approved by the Board of Supervisors); see also R. at 554 ("A special exception is subject to public hearings by the Planning Commission and Board of Supervisors with approval by the Board of Supervisors; a special permit requires a public hearing and approval by the Board of Zoning Appeals."). In this case, AT&T was required to obtain both a special exception and a special permit amendment because AT&T wanted to construct a mobile and land based telecommunication facility, a special exception use that requires approval of the Board of Supervisors, and wanted to place the facility at a community swimming club, a location which had formerly obtained a special permit for its specified use and needed BZA approval to alter the terms of the special permit. See Ordinance § 9-101 (establishes mobile and land based telecommunication facilities as Category 1 special exception uses); Ordinance § 8-401 (establishes community clubs, swimming clubs, tennis courts, and other community uses as Group 4 Special Permit Uses). As stated above, the Board of Supervisors' review of AT&T's special exception application is not before the Court. Thus, the Court need only focus on the standards applicable to the BZA's review of special permit applications under the Ordinance.

### 1. *Fairfax County Zoning Ordinance*

Section 2-303 of the Ordinance states that "[n]o use of a structure or land that is designated as a special permit use . . . shall hereafter be changed to another use . . . unless a special permit has been approved by the BZA and the use has been established in accordance with the provisions of Article 8." Article 8, § 8-001, of the Ordinance establishes the purpose and intent of special permits:

> The BZA may approve a special permit under the provisions of this Article, when it is concluded that the proposed use complies with all specified standards and that such use will be compatible with existing or planned development in the general area. In addition, in approving a special permit, the BZA may stipulate such conditions and restrictions, including, but not limited to, those specifically contained herein, to ensure that the use will be compatible with the neighborhood in which it is proposed to be located. Where such cannot be accomplished, or it is determined that the use is not in accordance with all applicable standards of this Ordinance, the BZA shall deny the special permit.

Section 8-006 of the Ordinance provides the general standards that must be satisfied in order for the BZA to grant a special permit. These standards are included below:

1. The proposed use at the specified location shall be in harmony with the adopted comprehensive plan.

2. The proposed use shall be in harmony with the general purpose and intent of the applicable zoning district regulations.

3. The proposed use shall be such that it will be harmonious with and will not adversely affect the use or development of neighboring properties in accordance with the applicable zoning district regulations and the adopted comprehensive plan. The location, size, and height of buildings, structures, walls, and fences, and the nature and extent of screening, buffering, and landscaping shall be such that the use will not hinder or discourage the appropriate development and use of adjacent or nearby land and/or buildings or impair the value thereof.

4. The proposed use shall be such that pedestrian and vehicular traffic associated with such use will not be hazardous or conflict with the existing and anticipated traffic in the neighborhood.

5. In addition to the standards which may be set forth in this Article for a particular group or use, the BZA shall require landscaping and screening in accordance with the provisions of Article 13.

6. Open space shall be provided in an amount equivalent to that specified for the zoning district in which the proposed use is located.

7. Adequate utility, drainage, parking, loading, and other necessary facilities to serve the proposed use shall be provided. Parking and loading requirements shall be in accordance with the provisions of Article 11.

8. Signs shall be regulated by the provisions of Article 12; however, the BZA, under the authority presented in Sect. 007 below, may impose more strict requirements for a given use than those set forth in this Ordinance.

## 2. *Fairfax County Comprehensive Plan*

Standard 1 of § 8-006 directs the BZA to ensure that the proposed use is in harmony with the adopted comprehensive plan. The Fairfax County Comprehensive Plan ("Comprehensive Plan") provides specific objectives related to the siting and design of mobile and land-based telecommunications services, objectives that that BZA cited in its decision and were cited throughout the record by those in support of the BZA's decision. See Fairfax County Comprehensive Plan, 2013 Edition, Policy Plan, Public Facilities 37-48. The Court references the 2013 Edition of the Comprehensive Plan because it is amended through 4/30/2013. Thus, this would have been the Comprehensive Plan Edition available to the BZA when making its July 31, 2013, decision. The Court notes that some citizens opposing AT&T's application referenced the 2011 Edition (which appears to differ slightly from the 2013 edition), but that other citizens cited the 2011 Edition as amended through 4/30/13 and identified additions to the 2013 edition. R. 978; R. at 1215. Additionally, the Court observed that portions of AT&T's application, such as AT&T's statements of justification, referenced the 2003 edition. R. at 31, 34; R. at 354. Furthermore, the Staff Report used the 2011 edition of the Comprehensive Plan, as amended through 1/10/05. R. at 462. Regardless, the Court chooses to rely on the 2013 Edition as it was available when the BZA made its decision. Relevant portions of those objectives are included below:

> Objective 42: In order to provide for the mobile and land-based telecommunication network for wireless telecommunication systems licensed by the Federal Communications Commission, and to achieve opportunities for the co-location of related facilities and the reduction or elimination of their visual impact, locate the network's necessary support facilities which include any antennas, support structures, and equipment buildings or equipment boxes in accordance with the following policies.
>
> Policy a. Avoid the construction of new structures by locating proposed telecommunication facilities on available existing structures such as rooftops, telecommunication and broadcast support structures, electrical utility poles and towers, and water storage facilities when the telecommunication facilities can be placed inconspicuously to blend with such existing structures ....
>
> Policy b. When existing structures are not available for co-location or co-location is not appropriate because of adverse visual impacts or service needs, locate new structures that are required to support telecommunication antennas on

properties that provide the greatest opportunity to conceal the telecommunication facilities and minimize their visual impact on surrounding areas.

Policy c. When new structures or co-locations are required to serve residential neighborhoods, consider minimizing visual impacts on the surrounding area by utilizing camouflage structure design and/or micro-cell technologies or similar miniaturization technologies, such as distributed antenna systems (DAS), if feasible.

Policy d. When multiple sites provide similar or equal opportunity to minimize impacts, public lands shall be the preferred location.

Policy e. Locate mobile and land-based telecommunication facilities on public property only after a lease agreement between the County, or related board or authority, and the service provider has been established.

Policy f. Ensure that the use of public property by mobile and land-based telecommunication facilities does not interfere with the existing or planned operational requirements of the public use and complies with adopted policies and plans to protect natural resources.

Policy g. Co-locate mobile and land-based telecommunication facilities operated by different service providers on single sites and/or structures whenever appropriate. Locate single-use structures on a property only when a co-location structure for multiple service providers is not desirable or feasible due to technological differences, site limitations, or visual impact concerns.

Policy h. Ensure that the height of the proposed telecommunication facility is no greater than necessary to allow for co-location on the telecommunication facility based on its service area requirements while still mitigating the visual impact of the facility.

Policy i. When new structures, co-locations, and/or technologies (such as distributed antenna systems, micro-cell technology, or miniaturization technology) are necessary to meet the service area requirements for the residential neighborhood(s), ensure that the height and mass of any appropriate co-location on the telecommunication facility is in

character with the surrounding residential area and mitigates the visual impact of the facility on the surrounding residential area.

Policy j. Design, site, and/or landscape proposed telecommunication facilities to minimize impacts on the character of the property and surrounding areas. Demonstrate the appropriateness of the design through facility schematics and plans which detail the type, location, height, and material of the proposed structures and their relationship to other structures on the property and surrounding areas.

Policy l. A key concept in assessing telecommunication facilities is mitigation which is defined as actions taken to reduce or eliminate negative visual impacts. Mitigate the visual impact of proposed telecommunication facilities and their equipment, by using effective design options appropriate to the site such as:

1. Design, site, and/or landscape the proposed facility to minimize impacts on the character of the area;

2. Locate proposed telecommunication facilities near or within areas of mature vegetation and trees that effectively screen or provide an appropriate setting for the proposed structure provided such location does not adversely impact sensitive resources or cause fragmentation of forested communities. When viewed in context, consider perspective views, relative topography, and other factors to mitigate the visual presence and prominence of the structure;

3. Blend proposed telecommunication facilities with an existing pattern of tall structures;

4. Obscure or block the views of proposed telecommunication facilities with other existing structures, vegetation, tree cover, or topographic features to the maximum extent feasible; and

5. Replace existing telecommunication facilities with taller structures or extend their overall height to reduce the need for another structure when such height increases or structure replacements are visually appropriate to the site, including the surrounding area and are consistent with the type, style, and pattern of the existing structure.

Policy m. Locate proposed telecommunication facilities to ensure the protection of historically significant landscapes and cultural resources. The views of and vistas from architecturally and/or historically significant structures should not be impaired or diminished by the placement of telecommunication facilities.

Policy n. Site proposed telecommunication facilities to avoid areas of environmental sensitivity, such as steep slopes, floodplains, wetlands, environmental quality corridors, and resource protection areas.

Policy o. Site proposed telecommunication facilities to allow for future expansion and with corresponding levels of screening to accommodate expansion . . . .

Objective 43: Design proposed telecommunication facilities to mitigate their visual presence and prominence, particularly when located in residential areas, by concealing their intended purpose in a way that is consistent with the character of the surrounding area . . . .

Policy a. Disguise or camouflage the appearance of proposed telecommunication facilities to resemble other man-made structures and natural features (such as flagpoles, bell towers, and trees) that are typically found in a similar context and belong to the setting where placed.

Policy b. Design proposed telecommunication facilities that are disguised and camouflaged to be of a bulk, mass, and height typical of and similar to the feature selected.

Policy c. Use other new and existing structures and vegetation of comparable form and style to establish a grouping that complements a camouflaged telecommunication facility and supports its design, location, and appearance . . . .

### III. *Standard of Review*

The matter before the Court is the BZA's denial of a special permit. Although Va. Code § 15.2-2314 does not explicitly refer to a "special permit," it does state that its provisions apply to "any decision of the board of zoning appeals that denied or granted an application for a variance, or application for a special exception . . . ." While a "special permit" is not

identical to a "special exception" or a "variance," Petitioner argues, and the Court agrees, that § 15.2-2314 applies in the instant case.

Therefore, the Court starts with the recognition that "the decision of the board of zoning appeals shall be presumed to be correct." § 15.2-2314; see, e.g., *Alleghany Enters., Inc. v. Board of Zoning Appeals*, 217 Va. 64, 67, 225 S.E.2d 383 (1976) ("There is a presumption that the Board's decision was correct, and the burden is on the appellant to overcome this presumption.") (citing *Board of Zoning Appeals v. Combs*, 200 Va. 471, 476-77, 106 S.E.2d 755 (1959)). Broadly speaking, a petitioner seeking to rebut the presumption of correctness may attack the legal basis for the BZA's decision, the factual basis for the BZA's decision, or both. In this case, the Petitioner does challenge the BZA's decision on both the law and the facts, and therefore, the Court discusses the standard applicable to each. Petitioner also argues that the decision of the BZA was arbitrary, capricious, and unreasonable.

A. *Standard of Review Applicable to the BZA's Application of Principles of Law*

The standard of review as to the BZA's application of principles of law is established by § 15.2-2314, which states in part:

> In the case of an appeal by a person of any decision of the board of zoning appeals that denied or granted an application for a variance, or application for a special exception, the decision of the board of zoning appeals shall be presumed to be correct. The petitioner may rebut that presumption by showing to the satisfaction of the court that the board of zoning appeals applied *erroneous principles of law* . . . .

While courts have not precisely defined this standard, the case law provides numerous examples from which the Court can delineate its meaning. In *Hopkins v. O'Meara*, the Virginia Supreme Court concluded that a BZA's decision was "without warrant in law" and therefore "illegal and plainly wrong" because the BZA "undertook to do indirectly what it lacked authority to do directly," in this case to take away petitioner's special permit that was previously granted to him under the ordinance. 197 Va. 202, 206-07, 89 S.E.2d 1 (1955). In *National Memorial Park, Inc. v. Board of Zoning Appeals of Fairfax Cnty.*, the Virginia Supreme Court noted that the BZA applied the standards in Fairfax County Zoning Ordinance § 8-006 in denying Memorial Park's special permit application. 232 Va. 89, 92-93, 348 S.E.2d 248 (1986). Because the BZA "applied the correct principles of law as established by the zoning ordinance" and the decision was not plainly wrong in view of the evidence, the court held that the trial court did not err in affirming the BZA's decision. *Id.* at 93. As in *National Memorial*

*Park,* the BZA in this case was required to follow the principles of law applicable to special permit applications, which are found in § 8-006 of the Ordinance and certain objectives in the Comprehensive Plan.

### B. *Standard of Review Applicable to the BZA's Factual Findings*

This is a case involving the exercise of discretion by the BZA. AT&T does not dispute that this case involves the exercise of discretion by the BZA, but argues that the BZA's "exercise of its discretion . . . [was] plainly wrong and in violation of the purpose and intent of the Zoning Ordinance." Pet. 4. Section 15.2-2314 sets out the standard of review in such a case: "The petitioner may rebut that presumption by showing to the satisfaction of the court that . . . where the discretion of the board of zoning appeals is involved, the decision of the board of zoning appeals was plainly wrong and in violation of the purpose and intent of the zoning ordinance." Thus, there are two parts to this standard of review. In order to rebut the presumption of correctness, the Petitioner must show both that the BZA's decision was "plainly wrong" and that it was "in violation of the purpose and intent of the zoning ordinance."

#### 1. *"Plainly Wrong"*

It may be argued that the term "plainly wrong" applies to both the BZA's application of law and its findings of fact. By making this standard a part of the factual findings section of this opinion, the Court does not mean to suggest that case law does not employ the term "plainly wrong" in the legal context as well. See, e.g., *Hopkins,* 197 Va. at 206-07 ("The Board thus undertook to do indirectly what it lacked authority to do directly . . . . The action of the Board in refusing to grant the Use Permit was therefore without warrant in law and was consequently illegal and plainly wrong."). In the instant case, it is sufficient to say that the Court does not find the BZA's application of legal principles to be either "erroneous" or "plainly wrong." Additionally, it may be argued that the "plainly wrong" standard applies to the totality of the BZA's decision. Even in that context, the Court, for the reasons described below, does not find the decision to be "plainly wrong" and "in violation of the purpose and intent of the zoning ordinance."

The term "plainly wrong" is not defined by statute, but it is clear and unambiguous in this context, and the Court will employ the plain meaning of these words. "When interpreting statutes, courts must ascertain and give effect to the legislature's intention, which is to be deduced from the words used, unless a literal interpretation would result in a manifest absurdity." *Crawford v. Haddock,* 270 Va. 524, 528, 621 S.E.2d 127 (2005). If the statute's text is "clear and unambiguous . . . courts are bound by the plain meaning of clear statutory language." *Id.*; see also *Melanson v. Commonwealth,* 261 Va. 178, 183, 539 S.E.2d 433 (2001) ("The plain,

obvious, and rational meaning of a statute is to be preferred over any curious, narrow, or strained construction.").

According to *Merriam-Webster's Third New International Dictionary*, the word "plainly" is defined as "in a plain manner . . . with clarity of perception or comprehension . . . in unmistakable terms . . . with candor." *Webster's Third New International Dictionary* 1729 (2002). *Burton's Legal Thesaurus* equates "plainly" to words such as "fairly (clearly), only, purely (simply), solely (purely)." William C. Burton, *Burton's Legal Thesaurus* 913 (4th ed. 2006). *Black's Law Dictionary* defines "wrong" as a "breach of one's legal duty; violation of another's legal right." *Black's Law Dictionary* 1752 (9th ed. 2009). Under the umbrella of its "wrong" definition, *Black's* defines a "legal wrong" as "[a]n act that is a violation of the law; an act authoritatively prohibited by a rule of law." *Id.* Additionally, *Ballentine's Law Dictionary* defines "wrong" as "[t]he infringement of a legal right belonging to a definite specific person . . . . In common usage, an act in violation of a moral principle." *Ballentine's Law Dictionary* 1382 (3d ed. 1969). Finally, *Webster's* defines "wrong" as "in a way inconsistent with fact or truth; in a mistaken or erroneous manner; without accuracy." *Webster's, supra*, at 2642.

In zoning appeals cases, Virginia courts have frequently interpreted the "plainly wrong" standard in a manner consistent with the dictionary definition described above. See, e.g., *Alleghany*, 217 Va. at 69 ("We cannot say as a matter of law that there was no credible evidence on which the Board could justify its denial of the variance. Nor can we say as a matter of law that the ruling of the trial court, based upon the evidence presented to the Board, the evidence taken in the trial court, and the view taken by the trial court, was plainly wrong."); *Ramsey v. Board of Zoning Appeals of Town of Front Royal*, 68 Va. Cir. 135, 138 (2005) ("A decision of a board of zoning appeals should be overturned if the Court finds that the BZA erred in its decision . . . . To err means to make a decision contrary to the law or to make a decision based on a lack of sufficient evidence."). Where the term "plainly wrong" has been used in other legal contexts, a similar definition has been applied.

See, e.g., Va. Code § 8.01-680 ("When a case, civil or criminal . . . is decided by a court without the intervention of a jury and a party objects to the decision on the ground that it is contrary to the evidence, the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it."); see also *Barnes v. Moore*, 199 Va. 227, 228, 98 S.E.2d 683 (1957) ("In view of the judgment of the court in favor of the plaintiff, the evidence and all reasonable inferences therefrom, under settled principles, must be viewed by this Court in the light most advantageous to the plaintiff. The judgment cannot be set aside unless it appears from the evidence that it is plainly wrong or without evidence to support it . . . . Therefore, the 'question before

us is not whether the evidence would have supported a finding of fact for the losing party; but whether the record contains substantial credible evidence which will support the finding of the trial judge.' *Duncan v. Barbour*, 188 Va. 53, 55, 49 S.E.2d 260 [(1948)].").

Two additional points should be noted with regard to the "plainly wrong" standard. First, while an appeal of a BZA decision before a trial court "is not a trial *de novo*", the circuit court may take additional evidence if it deems it necessary. See *Alleghany*, 217 Va. at 67; Va. Code § 15.2-2314 ("If, upon the hearing, it shall appear to the court that testimony is necessary for the proper disposition of the matter, it may take evidence or appoint a commissioner to take evidence as it may direct and report the evidence to the court with his findings of fact and conclusions of law, which shall constitute a part of the proceedings upon which the determination of the court shall be made."). Therefore, although there "is a prima facie presumption that the power and discretion of the Board of Zoning Appeals have been properly exercised," a BZA decision may be disturbed if it "appears from the record transmitted to the court, *together with any additional evidence taken* and procedure had under the statute, that the decision of the [BZA] is plainly wrong." *Board of Zoning Appeals of the City of Alexandria v. Fowler*, 201 Va. 942, 948, 114 S.E.2d 753 (1960) (emphasis added); *Hopkins*, 197 Va. at 205.

Second, in evaluating the evidence before the BZA (or before the trial court if additional evidence was taken), the trial court must not substitute its judgment for that of the BZA. See *Fowler*, 201 Va. at 948-49 ("We are of the opinion that the lower court erred when it ignored the well-reasoned findings of the Board of Zoning Appeals and substituted its own independent judgment for that of the Board."); see also *Alleghany*, 217 Va. at 69 ("The evidence adduced by Alleghany tended to show that the residential zoning of the subject parcel was unreasonable and that a commercial zoning would be reasonable. But that is not the question before us. We cannot say as a matter of law that there was no credible evidence on which the Board could justify its denial of the variance. Nor can we say as a matter of law that the ruling of the trial court, based upon the evidence presented to the Board, the evidence taken in the trial court and the view taken by the trial court was plainly wrong.").

## 2. *"In Violation of the Purpose and Intent of the Zoning Ordinance"*

As stated above, in order to rebut the presumption of correctness, the BZA's decision must be both plainly wrong and in violation of the purpose and intent of the zoning ordinance. Ordinance § 8-001 provides the purpose and intent of special permit uses, allowing the BZA to approve a special permit when it concludes "that the proposed use complies with all specified standards and that such use will be compatible with existing or planned development in the general area." Ordinance § 1-200 states that the purpose and intent of the zoning ordinance as a whole is "to promote the health, safety, and general

welfare of the public and to implement the adopted comprehensive plan for the orderly and controlled development of the County."

Section 1-200 further states that:

[T]he Zoning Ordinance is designed to give reasonable consideration to each of the following purposes, where applicable:

1. to create and maintain conditions under which people and their environment can exist in a productive and enjoyable harmony while fulfilling the social, economic, and other requirements of present and future generations;

2. to facilitate the creation of a convenient, attractive, and harmonious community . . . .

3. to provide for County growth that is consonant with the efficient and economic use of public funds and environmental quality;

4. to recognize the needs of agriculture, housing, industry, and business in the County's future growth;

5. to promote the creation and expansion of land uses that will be developed with adequate highway, utility, health, education, and recreational facilities;

6. to provide residential areas with healthy surroundings for family life;

7. to protect against destruction of or encroachment upon historic areas . . . .

9. to promote the conservation of natural resources;

10. to encourage the preservation of stream valleys, steep slopes, lands of natural beauty, dense forestation, scenic vistas, and other similar areas and to ensure that development in such areas is well controlled . . . .

## C. *Arbitrary, Capricious, and Unreasonable*

While the arbitrary, capricious, and unreasonable standard does not appear in § 15.2-2314, this is a recognized standard throughout the relevant case law because "a decision to grant or deny a special use permit is a legislative, not an administrative, function." *National Memorial Park*, 232 Va. at 249-50 (citing *Bollinger v. Roanoke Cnty.*, 217 Va. 185, 186 (1976);

*Byrum v. Orange Cnty.*, 217 Va. 37, 41 (1976); *Civic Assoc. v. Chesterfield Cnty.*, 215 Va. 399, 401-02, 209 S.E.2d 925 (1974)). Because "[z]oning boards must exercise their expertise and discretion when making decisions on proposed special uses . . . judicial interference is permissible only if the Board's action is arbitrary and capricious, constituting a clear abuse of its discretion." *Id.* (citing *Board of Zoning App. v. O'Malley*, 229 Va. 605, 608, 331 S.E.2d 481 (1985); *Board of Zoning Appeals v. Fowler*, 201 Va. 942, 948, 114 S.E.2d 753 (1960)).

Furthermore, a legislative act "is presumed to be valid so long as it is not unreasonable and arbitrary" and "the party challenging the action has the burden of rebutting the presumption." *Board of Supervisors v. Snell Corp.*, 214 Va. 655, 658, 202 S.E.2d 889 (1974); *National Memorial Park*, 232 Va. 89, 348 S.E.2d at 250. "This is true whether the special use decision is made by the legislative body or pursuant to a delegation of power to a board of zoning appeals." *National Memorial Park*, 232 Va. 89, 348 S.E.2d at 250 (citing *Civic Assoc.*, 215 Va. at 401-02). The presumption of legislative validity that attaches to the BZA's denial of AT&T's permit is a presumption of reasonableness. See *Board of Supervisors v. Robertson*, 266 Va. 525, 532, 587 S.E.2d 570 (2003); *Board of Supervisors v. McDonald's Corp.*, 261 Va. 583, 590, 544 S.E.2d 334 (2001). In order to overcome the presumption of reasonableness, the Petitioner must present probative evidence of unreasonableness. *Ames v. Town of Painter*, 239 Va. 343, 347, 389 S.E.2d 702 (1990). If this presumption is overcome, the BZA must meet the challenge with some evidence of reasonableness. *Id.*

"Legislative action is reasonable if the matter in issue is fairly debatable." *Board of Supervisors v. Lerner*, 221 Va. 30, 34, 267 S.E.2d 100 (1980). "An issue may be said to be fairly debatable when, measured by both quantitative and qualitative tests, the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions." *Id.* (citing *Fairfax Cnty. v. Williams*, 216 Va. 49, 58 (1975)). In *Snell Construction Corp.*, 214 Va. at 659, the Virginia Supreme Court established the following test to determine whether the presumption of reasonableness should prevail or has been overcome:

> Where presumptive reasonableness is challenged by probative evidence of unreasonableness, the challenge must be met by some evidence of reasonableness. If evidence of reasonableness is sufficient to make the question fairly debatable, the ordinance "must be sustained." If not, the evidence of unreasonableness defeats the presumption of reasonableness and the ordinance cannot be sustained.

### IV. *Pertinent Facts*

The factual considerations underlying the BZA's decision can be divided into several major categories. This section provides a summary of the BZA's factual findings within each of these categories, followed by a summary of AT&T's evidence in support of its application and then by a summary of the evidence in opposition to AT&T's application. The Court focuses on the factual findings in the BZA's written decision, but supplements these conclusions with statements made by BZA members during the July 31st hearing at which the BZA voted on the motion to deny AT&T's application. The evidence in support of AT&T's application is drawn largely from the Staff Report, AT&T's application and revised statement of justification, AT&T's presentation to the BZA at the July 17th hearing, and AT&T's proposed development information. Evidence in opposition to the application is derived primarily from the petition in opposition, letters from citizens, and memoranda in opposition.

### A. *Visual Impact and Mitigation of Visual Impact*

#### 1. *BZA Decision*

The BZA discussed the visual impact of the proposed monopole/monopine and the mitigation of that impact within the context of Standard 1 of Ordinance § 8-006, which directs the BZA to ensure that "the proposed use of the specified location shall be in harmony with the adopted comprehensive plan." R. at 1340. In evaluating this standard, the BZA noted that a "key concept in assessing telecommunications facilities is mitigation, which is defined as actions taken to reduce or eliminate negative visual impacts." R. at 1340. The BZA referenced the Staff's analysis, which stated that plan guidelines allow for telecommunications facilities to be placed in "predominantly residential areas when other more suitable land uses . . . are not available and the facility is located to blend into its surroundings." R. at 1340. Additionally, the BZA cited the Staff report's conclusions that the visual impacts of the facility "may not be fully mitigated for some of the surrounding properties," and that, although the facility would have a "clear impact to some adjacent properties," the impact to the remaining property would be "reasonably mitigated." R. at 1340. Furthermore, the BZA found that the monopole would "extend 50 to 75 feet above the tree line," regardless of whether the pole "purports to blend into the sky." R. at 1340. During the BZA's July 31st hearing, BZA member Hart stated that the view was "essentially unmitigated" for several houses in the area in light of the topography of the site and the fact that the monopole was taller than the trees. R. at 1135. Finally, the BZA found that, because the trees in the area of the proposed facility are deciduous, the trees would be barren

of leaves for a significant portion of the year and residents adjacent to the monopole would have a direct view of the pole. R. at 1341.

## 2. *Evidence Offered in Support of the Application*

AT&T performed a balloon test and created monopole/monopine simulations to demonstrate the visual impact of the facility on the surrounding areas. R. at 299; R. at 391-438. Many of the pictures are in black and white and were difficult for the Court to interpret. However, during trial, the Court also received color copies of the simulations that were presented to the BZA at the July 17th hearing. The Staff report concluded that "photo simulations suggest that both monopine/monopole options limit the overall visual impacts to most areas during periods of full foliage and to a lesser extent during periods when the surrounding trees have little or no foliage in a manner which generally blends into the surrounding skyline." R. at 299.

The Staff report stated that the proposed location of the facility is in a heavily forested area and that there is "significant topographic relief because of heavy mature vegetation. R. at 293, 298. The Forest Conservation Branch for Fairfax County found that the area surrounding the proposed location is "occupied primarily by upland hardwood forest and scattered evergreens." R. at 537. Additionally, Staff noted that the facility would be partially screened by existing trees and that AT&T would be planting new trees and retaining mature trees. R. at 298-99. AT&T agreed to plant forty-two new trees around the facility. R. at 1322.

The Staff discussed the different visual impacts from the monopine as compared to the monopole, but concluded that the monopole was the "least adverse visual alternative." R. at 299-300. According to Staff, the monopine is most beneficial "from vantage points where the monopine's height differential (relative to the existing treeline) is less noticeable and the structure blends in with the existing vegetation." R. at 299. The monopole is most effective where its differential is the most noticeable because "its reduced diameter (as compared to the treepole) makes for a less obtrusive visual presence." R. at 299.

The monopole recommended by Staff is intended to blend into the tree cover and then the sky as it progresses from brown to light blue. R. at 300, 1322.

Staff found that the visual impacts of the facility were reasonably mitigated for the overwhelming majority of surrounding properties. R. at 300.

AT&T submitted additional changes to its original application that were intended to mitigate the visual impact. It submitted a split design in which the support structure and equipment compound would be installed on opposite sides of the drive to allow for maximum setback. R. at 368, 1322.

### 3. *Evidence Offered in Opposition to the Application*

The pole will extend between 50-75 feet above the tree line. R. at 977, 1091, 1156. Staff reported that the proposed tower "would stand approximately sixty feet above the existing canopy." R. at 1398. Numerous letters and memoranda stated that the pole would be a thirteen-story structure that would rise 60 feet above the tree line. R. at 1020, 1088, 1089, 1099, 1298.

The visual impact of the pole is exacerbated by the fact that most of the homes in the area are two stories at most, and many homes are one-story ramblers. R. at 1018, 1099, 1213.

The monopine will not blend into its surroundings because the trees in the area are deciduous. R. at 977, 979. The Court notes that this comment and related criticisms apply to the monopine design option only and that AT&T submitted both monopine and monopole options to the BZA.

Many residents asserted that the graduated monopole would not blend in well to the surroundings either. See, e.g., R. at 1182 ("I'm afraid that the sky constantly changes color in our neighborhood . . . any conventional paint color or colors used would render the structure obtrusive over most of the sky color conditions that will occur."); R. at 1091 ("A 'painted' cell tower will not 'disappear' into the skyline as it is too close to have that effect."); R. at 1243 ("A graduated paint tower, fifty yards away, will not be invisible against the 'horizon'."). When AT&T was questioned about other examples of a graduated paint scheme monopole by a Mason District Land Use Committee Member, it provided an example of a monopole at Gilbert's Corner. R. at 1297. Two residents went to Gilbert's Corner, took pictures of the site, and opined that the camouflage paint scheme was unsuccessful at that location. R. at 1297; R. at 1304-06 (pictures). Some residents asserted that the application of a graduated paint scheme such as that proposed by AT&T has never been employed in a residential area and has only been used agricultural land and parkland. R. at 1142, 1216, 1250.

Staff reported that there would be a clear visual impact to some adjacent properties and that visual impacts may not be fully mitigated for some surrounding properties. R. at 298, 300. Additionally, Mary L. Daniel, a Northern Virginia realtor who provided a professional opinion on the effect of the pole on home values, stated: "Fairfax county has maintained site lines across the county and nowhere do you see, in a residential area, cell towers so immediately visible to the residents." R. at 1132.

A sample of visually impacted homes, based on observation and photographs taken during balloon flies on 2/2/13 and 2/18/13, shows over 75 homes being visually impacted by the proposed facility. R. at 1247. Additionally, in "Residents' Statements in Opposition to Application Number SPA-76-M-088," filed with the Department of Planning and Zoning on July 23, 2013, one resident asserted that the pole would be plainly visible to twenty-nine homes on Teton Place, Crater Place, and Tonto Court

alone and would also visible to additional homes on Everglades Drive, Yellowstone Drive, and Dowden Terrace. R. at 1214. Furthermore, BZA member Smith personally visited the proposed site and observed that the facility would be "very obtrusive and visible" from the homes on Teton Place in particular. R. at 1436. Finally, Ms. Daniel, the realtor referred to above, stated that the proposed cell tower would be immediately and highly visible in full and above the tree line to homes on Everglades, Yellowstone, Teton, and Crater Places, as well as to homes on Faith, Hatton, Dawes, Hawthorne, and Holmes Run Parkway. R. at 1132.

Individuals opposing the tower argued that the pictures presented by AT&T were misleading and did not demonstrate the true visual impact of the proposed monopole/monopine. R. at 1023-24, 1111-31, 1267, 1288-94.

One resident, a professional commercial and editorial photographer since 1988, stated that AT&T's pictures were "of low resolution, overall poor quality, and nearly indecipherable in their contrast." R. at 1267. He asserted that, in his professional judgment, the photos "were taken with a wide angle lens . . . from a distance with a visual obstruction very near where the proposed tower is supposed to be. This appears to be an attempt to obscure the negative visual impact that would be created by the proposed tower. In short, these photos are misleading." R. at 1267.

Additionally, a Memorandum in Opposition to AT&T's application asserted that AT&T's photo presentation was inherently defective because it did not include recorded images taken from the properties of nearby residential homes which stand to suffer the most significant impact from the facility. R. at 1023-24.

In support of this assertion, the residents cited a federal case which discusses visual impact studies in the context of the Federal Telecommunications Act, 47 U.S.C. § 332(c)(7). See *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 533 (2d Cir. 2005) ("[T]he Board was free to discount Omnipoint's study because it was conducted in a defective manner. The study concluded that the tower 'would be visible from only one property outside the Golf Course.' However, because the study was conducted without notice to the Board or community, the observation points upon which its conclusion was based were limited to locations accessible to the public, mostly public roads, and no observations were made from the residents' backyards, much less from their second story windows. Moreover, the study suffered from the further defect that it failed to consider the tower's visibility in winter, when deciduous trees are bare. Accordingly, the study did not foreclose a finding that the tower would be widely visible.").

This memorandum also included a "Visual Impact" photo submission that depicted "actual visual impacts" that residents at 4125 Teton Place would experience. R. at 1022, 1111-31, 1288-94.

Although it is not entirely clear from the record, the Court concludes that some, but not all, of the pictures included in the opposition's memoranda and letters were taken by residents and not by AT&T. This supposition is informed by Steve Smith's quote at 1266, which states that residents provided the Land Use Committee with pictures they had taken, the fact that the pictures at 1111-31 are described in the relevant memoranda as "actual views" that 4125 Teton Place would sustain, and the fact that many of the photos at 1111-31 and 1288-94 include interior views that would not have been taken by AT&T. Additionally, this issue was discussed between Mr. Donohue and the BZA at the July 17, 2013, hearing. R. at 1425. At the hearing, Mr. Donohue stated that the photographs taken "in the backyards . . . in the back lot lines" and from inside homes were not AT&T's photos. R. at 1424. Additionally, Mr. Donohue expressed concern over pictures taken by the residents, stating that the photoshopping that was done "appears to be way out of scale from what we believe it to be." R. at 1425-26.

The Staff reported that the closest home would be 226 feet from the monopole. R. at 273.

The Court accepts that the distance between the monopole and the nearest residence would be 226 feet, but notes that one resident reported that the pole would be 90 to 100 feet from his home. R. at 1101. He stated that he measured the distance himself by tying a rope to the corner post of his fence (the property line) and dragging the rope to the proposed site of the monopole. R. at 1101.

B. *Compatibility with Zoned Land/Topographical Concerns*

1. *BZA*

The BZA discussed the compatibility of the proposed monopole/ monopine with the surrounding zoned land in the context of Standard 2 of Ordinance § 8-006, which directs the BZA to ensure that "the proposed use will be in harmony with the general purpose and intent of applicable zoning district regulations." R. at 1341. As to this standard, the BZA found that the proposed site was not compatible with the residentially zoned land based on information in the Staff report and testimony during the public hearing. R. at 1341. The BZA placed emphasis on the location of the facility on the proposed site and the mitigation techniques used, rather than the acreage of the site. R. at 1341. Thus, although the proposed site was 14.53 acres, its location in a resource protection area and floodplain made much of the site not useable and resulted in the placement of the monopole only 226 feet from the nearest residence. R. at 1341. Furthermore, the BZA found that AT&T did not propose certain mitigation techniques, such as placing a pole in a flagpole, a cross, or a church steeple, or placing a monopine in an area

populated by pine trees, that had been used in other applications the BZA had approved. R. at 1341.

In addition to the conclusions in the BZA's written decisions, many BZA members expressed concern over the topography of the proposed site and the potential incompatibility of the facility with the surrounding area during the July 31st hearing. R. at 1434-36. Members discussed topographical concerns in the context of Standards 1, 2, and 3 of § 8-006, with many unable to find that AT&T's application satisfied Standard 3 because of the topography. R. at 1434-36. Standard 3 of Ordinance § 8-006 mandates that "the proposed use shall be such that it will be harmonious with and will not adversely affect the use or development of neighboring properties in accordance with the applicable zoning district regulations and the adopted Comprehensive Plan. The location, size, and height of building structures, walls, fences, and the nature and extent of screening, buffering, and landscape shall be such that the use will not hinder or discourage the appropriate development use of adjacent or nearby land or buildings or impair the value thereof."

BZA member Beard stated that the "community seems to sit up," resulting in a "stadium effect" that makes the effect of the monopole substantial. R. at 1434. BZA member Hart concluded that in "other cases the pole still might work," but the topography of this site differentiated it from other neighborhood and community pool sites, specifically Holmes Run Pool and Broyhill Crest, at which the BZA had allowed the construction of telecommunications facilities. R. at 1435. He stated that "the difference was predominantly the topography . . . this site may even have been a bit larger, but because of the slope going down the hill and because the pole was already down the hill from the houses, there is no opportunity to conceal it. If the site were flat, if the trees were higher, if there was some other intervening circumstance, I think a [pole] in the middle of the community surrounded by big trees might work." R. at 1435. While Hart recognized that "this one came close" and "we are all going to see things," he concluded that the topography and proximity of the pole to certain houses prevented AT&T's application from satisfying Standard 3. R. at 1435. BZA member Smith stated that he had originally thought Parklawn would be an ideal site until he visited the location (specifically Teton Place) and discovered that "it really created a major issue." R. at 1436. Smith observed that, "even though the topography is such that it is further down and it is surrounded by trees, it still is very obtrusive and visible from the homes on that road in particular." R. at 1436.

## 2. *Evidence Offered in Support of the Application*

Much of the evidence described in Section A (topographic relief due to heavy vegetation, methods of mitigation, simulations of visual impact, etc.) would also apply to this category.

The proposed location consists of 14.54 acres. R. at 293.

Staff reported that the facility would not be located in a floodplain or other environmentally sensitive area, in accordance with the Comprehensive Plan. R. at 298. Additionally, AT&T's revised Statement of Justification included the relocation of the facility out of the floodplain and resource protection area ("RPA"). R. at 368.

Staff stated that "since the site is in a valley, the tower must reach a height tall enough . . . to communicate with other towers in the area . . . however staff believes the applicant has mitigated the impact to the greatest extent possible." R. at 303.

Staff found that "the proposed location has been determined ideal for adequate service for this facility consistent with the Plan guidelines." R. at 298.

Staff opined that "the proposed location, coupled with existing site conditions and substantial surrounding vegetation, will not hinder future development of adjacent parcels." R. at 303.

In a letter to the BZA that described the compatibility of the proposed facility with the surrounding area, AT&T took note of previously approved telecommunications facilities in residential areas. R. at 1325. AT&T listed the following swim clubs as examples: (1) Holmes Run Acres Recreation Association, 125-foot treepole on a 3.83 acre parcel in an R-3 zone (picture included at R. 1328); (2) Commonwealth Swim Club, 120-foot treepole on a 5.29 acre parcel in the R-2 zone; (3) West Springfield Village Swim Club, 120-foot monopole on a 2.59 acre parcel; and (4) Broyhill Crest Recreation Club, 150-foot treepole on a 2.47 acre parcel (picture include at R. 1329). R. at 1325. Additionally, AT&T listed the following locations as other examples of successful proposals: (1) Lord of Life Lutheran Church, replacing an 85-foot steeple with an 100-foot steeple on a 3.04 acre parcel in a R-1 zone; (2) Calvary Korean Baptist Church, 128-foot treepole on a 3.98 acre parcel in an R-1 zone; (3) Sydenstricker United Methodist Church, 100-foot flagpole on a 4.98 acre parcel in an R-1 zone; and (4) Sleepy Hollow United Methodist Church, 110-foot treepole on a 5.035 acre parcel in an R-2 zone. AT&T argued that its current proposal surpassed the above examples because of its split and stealth design, as well as the existing vegetation, topography, and size of the parcel. R. at 1325.

### 3. Evidence Offered in Opposition to the Application

The surrounding area is an R-3 residential zone. R. at 294. This facility would fundamentally change the character of the area by adding a commercial element to a residential area. R. at 978.

The facility would be located "right on the edge of the fifteen acre [Parklawn] lot, backed up to several two story residential homes." R. at 1265. The pole would be located 226 feet from the nearest residence. R. at 1424.

The topography in this location will maximize the visual impact of the proposed facility because the pole will be placed at a lower elevation than the surrounding homes. R. at 977, 1143, 1214, 1241.

The tower would be placed on a 13% grade slope and would have no trees in between it and most of the homes on the east side of Teton Place. R. at 1214. Because the elevation rises as one travels from Teton Place to Everglades Drive, the homes on Everglades, Yellowstone, and Conrad would have a view of the tower from their yards, decks, patios, and from inside their homes. R. at 1241.

Staff observed that "[s]urrounding properties are comprised of single-family detached dwellings, which are mostly situated on or near the top of the slopes surrounding the subject property." R. at 298. Staff found that "[d]ue to the topography of the area, it is impossible to completely conceal the tower . . . ." R. at 303. An arborist made the same point: "(It should go without saying that the tower itself is so tall that it cannot be hidden by vegetation no matter where it is.)." R. at 1086.

There are environmental concerns with this site, and the Comprehensive Plan instructs that proposed facilities should avoid areas of environmental sensitivity. R. at 978, 1244. This site is above Holmes Run, a designated environmental quality corridor. R. at 978, 1244. However, there are no provisions on the site plans for the fact that "properties doing site work must comply with regulations regarding run off from properties through the use of check dams, etc . . . . The site will be disturbed during construction and will not be able to adequately absorb the water, thus increasing the run off to Holmes Run." R. at 978, 1244. Although the actual facility would not be located on a floodplain or environmentally sensitive area, Staff noted that a "large portion of the [Parklawn] property lies within the 100-year floodplain and Resource Protection Area (RPA) for a portion of Holmes Run." R. at 298.

Numerous residents asserted that AT&T's proposed use was not compatible with the zoned land because it would destroy the aesthetic value of the local environment, disrupt residents' enjoyment of surrounding nature trails, negatively impact residents' quality of life, and spoil the view from many homes. R. at 682, 726, 976, 979, 995-96, 1088, 1099, 1168-69, 1203, 1209, 1273-74, 1283. Additionally, residents expressed concern over the fact that no "shadow study" had been conducted and opined that the tower would subject outdoor features such as pools, patios, decks, sunrooms, and play areas to "a massive shadow." R. at 1217. Some residents were hesitant to remodel the outside of their homes due to the possibility that the tower would be constructed. R. at 1217.

One of the objectives under the comprehensive plan is to avoid the construction of new structures and to employ the use of existing structures. AT&T's proposal would require the construction of a new structure. R. at 357, 977.

One resident claimed that "nowhere in Fairfax County does a similar situation exist ..." and that similar proposals in Fort Hunt and McLean had been rejected for visual impacts that were less severe than AT&T's proposal. R. at 1217.

Another resident indicated that the "noise generated by the equipment (55 decibels for the cooler and more for the generator) will carry uphill with an amphitheater effect" because of the site's topography. R. at 1244.

Many residents expressed safety concerns with the construction of a cell tower in a residential area. These concerns included fear of the carcinogenicity of radiofrequency electromagnetic fields, the dangers of falling ice or equipment, and the danger of the tower itself falling improperly in the case of an accident. R. at 684, 688, 1006, 1027-30, 1135-40, 1255-56, 1420. Furthermore, the tower would be constructed only fifteen feet off a roadway used as a community walkway to access the pool. R. at 1027. Letters in opposition asserted that this distance was not a sufficient safety zone and cited various articles and statutes from other states regarding "fallzones" to illustrate their point. R. at 1027-30, 1135-40.

One resident differentiated the Parklawn site from AT&T's example of Broyhill Crest Recreation Club (BRC), stating that the two sites were different because (1) BRC is on level ground and only the base of the tower can be seen on approach; (2) The tower is in the middle, not the edge, of a large wooded lot, surrounded by mature trees, and buffered on all sides by parking lots and more trees; and (3) the tower was welcomed by an overwhelming majority of surrounding residents. R. at 1266. Other residents stated that they had visited the cell towers at Broyhill Crest Pool and Holmes Run Pool and observed that the topography at those sites is "vastly different" than that of Parklawn because the other sites are mostly flat with tall trees that surround the poles. R. 1298.

C. *Effect on Property Values*

1. *BZA*

The BZA examined the effect of the proposed facility on home values in the area within its discussion of Standard 3 of Ordinance § 8-006. R. at 1341-42. In reviewing AT&T's Thorne Evaluation Study, discussed below, the BZA noted that five of the six sites analyzed in the study were in Maryland and found that the study would have been more relevant if it had focused on patterns in Fairfax County. R. at 1341. Although the BZA agreed with the study that some of the primary reasons people purchase homes are related to schools, the neighborhood, and transportation options, it described a simpler test to determine whether the monopole affects home value: If one compares two houses that have the exact same characteristics and benefits, but one of those houses has a 128-foot monopole in the

backyard, which one would an individual choose to purchase? R. at 1341-42. The BZA concluded that the home without the monopole would be purchased, placing the homeowner in a situation where she either has to reduce the price of her property or leave it on the market for a longer time. R. at 1342. The BZA found that this situation would decrease the value of an individual's home. R. at 1342.

## 2. Evidence Offered in Support of the Application

AT&T hired property valuation expert Oakleigh Thorne to prepare an analysis of the effect of the proposed pole on property values in the area. R. at 1326, 1332-38. In conducting its analysis, Thorne Consultants utilized knowledge from twelve other studies it has conducted since 1996 at eight different telecommunications sites, sites in Montgomery County, Maryland, Howard County, Maryland, Kent and Queen Anne Counties, Maryland, Owings Mill, Maryland, and Fairfax County, Virginia. Additionally, Thorne used the Fairfax County Assessment website and the Metropolitan Regional Information Systems to determine sales and listing information for the homes in the vicinity of Crater Place (an area that Thorne concluded would have direct views of the tower). R. at 1333-34. Thorne's previous studies have found that a view of a telecommunications facility is not the issue; rather, the "driving forces behind home values are based on more important factors including the quality of the school district and reasonably convenient access to employment centers and consumer goods and services." R. at 1336. Based on its local area study and conclusions obtained from research at other sites, Thorne Consultants concluded that the proposed monopole would have no negative impact on surrounding properties or the general neighborhood at the subject site. R. at 1337.

## 3. Evidence Offered in Opposition to the Application

One of the memoranda in opposition includes a letter from Mary L. Daniel, a realtor who has worked in Northern Virginia for over fourteen years and has been an agent within and around the Parklawn subdivision for eight years. R. at 1132. Ms. Daniel concluded that, in her professional opinion based on her experience and knowledge of the real estate market in the Parklawn area, "the installation of the cell tower in the location proposed would most likely reduce the sales value of homes situated within close proximity to the proposed installation by approximately 18%, or within the range of 14% to 20%. . . . [and would] make them less desirable overall, meaning that they will undoubtedly take longer to sell, even at reduced prices, and will dissuade a substantial portion of potential purchasers from consider[ing] such homes at all." R. at 1132. To illustrate her point, Ms. Daniel provided an example of one of her current listings that has a utility structure in full view, she stated that it remained unsold

after twenty-one days on the market, even though her typical sales cycle is three to fifteen days. R. at 1132. She opined that the delay in responses was "directly attributable to the undesirability of the utility structure in close proximity to the property." R. at 1132. Ms. Daniel provided several reasons for her conclusion that property values would be negatively affected by AT&T's proposed facility: (1) The proposed tower would be "immediately and highly visible in full and above the treeline" to homes on Everglades, Yellowstone, Teton, and Crater Places, as well as to homes on Faith, Hatton, Dawes, Hawthorne, and Holmes Run Parkway. She noted that homeowners in Parklawn and Dowden Terrace purchase homes in part for the scenic vistas that stretch over Holmes Run Stream. (2) A home with an undesirable feature falls off the list of a potential homebuyer when choosing a place to live. This reduces the potential pool of purchasers for homes with negative views. Homes with cell towers in proximity are negatively affected in sale price, number of days spent on the market, the expense to sell, and the number of opportunities to sell. (3) Perceptions regarding the safety of cell towers (i.e. falling ice and equipment, perceived health risks), even if based on inconclusive evidence, have a negative effect on property values. People do not want to live in an area that they feel presents a risk and is unsafe. R. at 1132-33.

A Memorandum from Parklawn Area Citizens Against Cell Towers, L.L.C. ("PACACT") cited numerous sources for the proposition that cell towers have a negative effect on property value. R. at 981-83. The memo included the following quote from Mount Vernon District Planning Commissioner Earl Flanagan, speaking about property value depreciation as a result of cell tower construction in September 2011: "Buyers do not tell sellers why they do not come back to purchase. They speak with their disappearance. Why reduce the pool of potential buyers by introducing features many find undesirable." R. at 981-82.

PACACT also cited two journal articles that described studies related to the impact of commercial equipment on property value, an Appraisal Journal article conducted a survey which concluded that those surveyed would pay 10 to 20% less to over 20% less for a property in close proximity to a cell tower and an article in *The Journal of Real Estate Research* found that power lines can, on average, reduce property values by 14%. R. at 982-83.

One letter in opposition quoted Steve Smith, a voting member of Mason District Land Use Committee, on expectations in a residential neighborhood: "You buy something in a residential area, you should have a reasonable expectation that something of this magnitude would not get put in your neighborhood, and I think the pictures the residents have provided, that are most adjacent, are very different than what the pictures AT&T has provided . . . . I personally do not think it is an appropriate transition for the neighbors to have something of this magnitude next to them." R. at 1266.

One memorandum in opposition cited numerous articles and studies that concluded cell towers have a negative impact on property values. R. at 1025-26 (citing a February 2012 article discussing a New Jersey appraiser's analysis that close proximity to a cell tower reduces property value by more than 10% and citing three studies conducted between 1984 and 2004 which concluded that close proximity to a cell tower reduces property values anywhere from 1 to 20%). R. at 1025-26.

Many residents stated they would not have purchased their home if they had known a cell tower would be constructed, or provided examples of the specific impact the proposed cell tower was currently having on their property values. See, e.g., R. at 990 ("We never would have bought our house if we looked out our window at the proposed cell tower . . . we are worried that when it becomes time to sell our home, potential buyers will feel the same."); R. at 994-1001 ("When we purchased our home almost twenty years ago, we paid what the real estate agent called a 'lot premium' for the benefit of overlooking the woods of Holmes Run . . . if the proposed tower is approved, the lot premium we paid will quickly turn into a 'lot penalty.' As a Ph. D. economist, specializing in housing finance, I caution this committee that [studies presented by AT&T] must be carefully interpreted. While it may be true that improved cell phone coverage created by this tower may enhance value for homes located miles away from the tower, it may correspondingly hurt values for those homes . . . that will look directly onto the base of this Statute of Liberty size tower. Most studies of this type are based on a broad geographic area to reflect the full coverage of a cell tower . . . . As such, in these academic studies, the value improvement of some homes with improved coverage and no view of the tower may, in theory, offset the value loss of those homes staring into the tower. However, in reality, there is no offset for the homeowner harmed by the tower."); R. 1005-06 ("We have talked to real estate agents who have confirmed that the cell tower will likely decrease our property value and long term investment plans with the property."); R. at 1411-12 ("[H]ad anybody told me that a hundred-and-28-foot cell tower was going . . . to be built, I would not have purchased that home, nor would I have ever purchased a home had I driven up and seen a cell tower that stood a hundred and 128 feet tall and loomed 70 feet over a home."); R. at 1419 ("When we learned of the cell phone tower, it was a difficult decision, but we decided to move. We really did not want to. The house, again, has been on the MLS for 62 days, and it has not had a single offer. The Board of the Zoning announcement, there are two signs there . . . sitting right next to my house . . . . So not only no offers, but no offers even at the asking price, but no offers even below the asking price.").

D. *Community Opinions*

1. *BZA*

Although the BZA did not include its discussion of community opinions under the umbrella of Standard 3, this was a consideration in the BZA's determination. R. at 1342. The BZA found that 70% of the 158 members of Parklawn do not reside in the neighborhood that would be effected by the presence of the monopole and that, based on the circulated petition, "just about everyone in the community" was "dead set against this monopole." R. at 1342. BZA member Beard noted that many of the members of Parklawn do not live within the neighborhood, whereas the neighbors would be "facing this thing 24/7." R. at 1434.

2. *Evidence in Support of the Application*

Citizens in support of AT&T's application cited coverage issues, safety concerns, and funding for Parklawn pool as reasons to approve the application. See generally, R. at 599-678. Many community members expressed concern over the lack of coverage in the area and the impact that coverage gaps would have in an emergency situation. R. at 599, 602, 619, 622, 935, 1407-08. Additionally, some citizens supported the application because AT&T would offer a revenue stream for Parklawn pool that would enable the pool to stay open. R. at 601, 607, 868, 920.

3. *Evidence in Opposition to the Application*

Other than statements by other residents repeating these figures, the Court did not find evidence in the record explaining their origin. However, the BZA appeared to accept these figures as true by concluding that 70% of PRA members did not live in the relevant community and by stating that the community was "dead set" against the facility. R. at 1434.

PACACT maintained that 97% of the residents in the Parklawn and Dowden Terrace subdivisions who would be visually impacted by the monopole opposed it. R. at 981. Additionally, it stated that 69% of the residents in the Parklawn subdivision opposed the monopine and 61.2% of Parklawn subdivision and other subdivision residents eligible for membership in the Parklawn Recreation Association ("PRA") opposed the monopine. R. at 981.

The last page of the Petition in Opposition states that there were 177 signatures on the petition opposing AT&T's application. R. at 837.

70% of the 158 members of the Parklawn Recreation Association live in subdivisions other than Parklawn. R. at 1240, 1421.

E. *Alternative Technologies*

### 1. *BZA*

While the BZA did not discuss alternative technologies within a specific standard, the Court notes that this consideration appears in the Comprehensive Plan. See Objective 42, Policy c ("When new structures or co-locations are required to serve residential neighborhoods, consider minimizing visual impacts on the surrounding area by utilizing camouflage structure design and/or micro-cell technologies or similar miniaturization technologies, such as distributed antenna systems (DAS), if feasible."). With regard to this category, the BZA found that there were other technologies available that were never presented to the BZA and that it was never apprised as to why other techniques were not employed. R. at 1342.

### 2. *Evidence Offered in Support of the Application*

The Court's review of the record did not reveal any discussions of alternative technologies (other than monopole/monopine and stealth technology) in the Staff Report, in AT&T's application or Revised Statement of Justification, or during AT&T's presentation to the BZA at the July 17th hearing. However, there are statements in AT&T's Revised Statement of Justification and in the Staff Report explaining why AT&T chose the specific stealth and monopole/monopine designs. R. at 357-60, 464.

### 3. *Evidence Offered in Support of the Application*

Numerous residents asserted that AT&T's needs could be met with alternative technology that would have a lower aesthetic impact. R. at 977, 1182, 1242, 1248, 1411.

An engineer that specializes in areas related to radio frequency systems stated that AT&T's needs could be met though the use of a Distributed Antenna System ("DAS"), as well as technologies such as microcell, picocell, and femtocell, modern alternatives to monopoles. R. at 1182 (citing two articles about newer technology).

Additionally, AT&T advertises alternative technologies, such as DAS, as a substitute for towers in regions with difficult landscapes. R. at 977, 1242-43, 1248 (attachment of an internet print-out from AT&T's website regarding DAS technologies).

When asked about alternative technologies, specifically DAS technologies, at a community meeting on November 7, 2012, AT&T stated that it was not proposing other technologies, opting instead for mitigation with the stealth design. R. at 977, 1182, 1242; see also AT&T Meeting 11-7-2012, part IV, YouTube, available at https://www.youtube.com/watch?v=p_

uPst_HnHg (posted November 9, 2012). This video was cited by a resident at R. 1242.

F. *Alternative Sites*

### 1. *BZA*

Finally, the BZA also found that it was never apprised of the reasons other locations were not considered that could meet AT&T's coverage concerns and satisfy mitigation requirements. R. at 1342. Though not listed within Ordinance § 8-006, the consideration of alternative sites appears multiple times throughout the Comprehensive Plan. See, e.g., Objective 42, Policy a ("Avoid the construction of new structures by locating proposed telecommunication facilities on available existing structures such as rooftops, telecommunication and broadcast support structures, electrical utility poles and towers, and water storage facilities when the telecommunication facilities can be placed inconspicuously to blend with such existing structures."); Objective 42, Policy b ("When existing structures are not available for co-location, or co-location is not appropriate because of adverse visual impacts or service needs, locate new structures that are required to support telecommunication antennas on properties that provide the greatest opportunity to conceal the telecommunication facilities and minimize their visual impact on surrounding areas.").

### 2. *Evidence Offered in Support of the Application*

In a slideshow presented to the Mason District Land Use Committee on March 26, 2013, AT&T provided the following list of alternative locations it had considered: (1) Schools: William Ramsey Elementary School, Parklawn Elementary School, and Glasgow Middle School, (2) Parks: Dora Kelly Nature Park, Turkeycock Stream Valley Park, Dowden Terrace Park, Lillian Carey Park, Parklawn Park, Heywood Glen Park, Glasgow Park, Glen Hills Park, and (3) Privately-Owned Parcels: Peace Lutheran Church and Fountain Condominium. R. at 1354-57. The presentation stated that none of the alternative sites would work in this instance because they would not fill the coverage gap. R. at 1354. However, AT&T did note that it was considering Peace Lutheran Church as a possible additional site. R. at 1354.

AT&T's Revised Statement of Justification and March 25, 2013, letter to Staff provided reasons as to why specific alternative sites were rejected. R. at 355-57; 383-88. Regarding William Ramsey Elementary, Parklawn Elementary, and Glasgow Middle School, AT&T found that these sites lacked opportunity for vegetative screening and site integration or did not meet Radio Frequency ("RF") coverage objective. R. at 355-56, 384-85. The park sites considered by AT&T (listed above) had challenges associated with site access, site clearing, neighborhood compatibility, and RF objectives. R.

at 356. Among the private sites referenced, Peace Lutheran Church, Queen of Apostle Church, Fountain Condominium, and Parklawn, the Parklawn location provided the most central location to eliminate coverage gaps, as well as opportunities to screen and buffer the use. R. at 356, 386-87.

### 3. Evidence Offered in Opposition to the Application

Community members opposing AT&T's Application asserted that AT&T dismissed sites without adequate consideration and technical evidence as to why they were not viable options. R. at 980, 1142, 1182, 1419, 1215.

PACACT objected to AT&T's assertion that the alternative sites considered were not centrally located, stating that these sites were in fact centrally located in the areas that required enhanced coverage. R. at 980. Additionally, PACACT took issue with AT&T's assertion that alternative park sites were "generally natural areas or sites with only minor recreational activities and development and have many challenges with site access, site clearing to provide for new structure, screening, and overall neighborhood compatibility," arguing that these same characteristics exist at Parklawn. R. at 980.

During the July 17, 2013, hearing, one resident testified that there were very good alternative sites, but AT&T would have to pay commercial rates for these lots. R. at 1419. Additionally, this resident suggested that the Mark Center and the Queen of Apostles Church, a site that was dismissed by AT&T, would have been viable alternatives because they would have addressed the relevant coverage gaps. R. at 1419.

Another resident stated she had spoken with several locations, such as Queen of Apostles Church, the Mark Center BRAC building, Glasgow Middle School Parkland, Barcroft Plaza, Landmark Mall, and the new development along the N. Beauregard Street corridor, and had been informed that AT&T had not approached these sites to discuss options. R. at 1215. She also stated that AT&T had an "antenna slated for Peace Lutheran Church." R. at 1215.

Many residents took issue with AT&T's information regarding coverage gaps, stating that AT&T's online coverage maps and marketing materials for the pertinent areas showed that the areas were rated as "best" or "good" coverage. R. at 980, 986 (attachments of AT&T coverage maps), 1017, 1080-84 (online print-outs of AT&T's coverage maps), 1182. Additionally, many residents reported that they did not experience cellular reception issues. R. at 980, 1018. Furthermore, a group of residents performed test calls, including 911 testing, which were accompanied by call logs and affidavits. R. at 1018, 1032-78. This testing consisted of 375 call or text attempts, in which none of the attempts failed. R. at 1018.

## V. *Analysis*

The Petitioner argues that the BZA's decision denying AT&T's application for a special permit should be reversed because the BZA erroneously applied principles of law, its decision was plainly wrong and in violation of the purpose and intent of the Ordinance, and its decision was arbitrary, capricious, and unreasonable. The Court addresses each of AT&T's arguments in turn and concludes that the BZA's decision should be affirmed.

### A. *Erroneous Principles of Law*

As stated above, the standard of review applicable to the BZA's legal determinations is whether the BZA followed the principles of law applicable to special permit applications, as found in the Zoning Ordinance and Comprehensive Plan. Petitioner argues that the BZA relied on erroneous principles of law in evaluating Standards 1, 2, and 3 of Ordinance § 8-006.

With regard to Standard 1, Petitioner first argues that the BZA applied erroneous principles of law by finding that "a key concept in assessing telecommunications facilities is mitigation, which is defined as actions taken to reduce or eliminate negative visual impacts." AT&T argues that the BZA, by using the "reduce or eliminate" language, is requiring an applicant to demonstrate that its proposed facility will have no visual impact, a requirement that is not contained in the Ordinance and is impossible for an applicant to meet. This argument is unpersuasive for two reasons. First, although the above quoted language is not found in the Ordinance, it is found verbatim in the Comprehensive Plan at Objective 42, Policy 1. Since Standard 1 of § 8-006 directs the BZA to ensure that the proposed use is in harmony with the Comprehensive Plan, the BZA correctly relied on the above principle of law because it is found in the Comprehensive Plan. Second, the BZA at no point stated that AT&T's proposed facility must have no visual impact to obtain a special permit. Rather, the BZA provided a standard that defines "mitigation" as "action taken to reduce or eliminate negative visual impacts." R. at 1340 (emphasis added).

Second, Petitioner argues that the BZA erred in evaluating Standard 1 because the Planning Commission had previously found AT&T's application to be in accordance with the Comprehensive Plan and the BZA did not have the authority to overrule the Planning Commission's decision. The Court finds no basis in the Virginia Code, the Fairfax County Zoning Ordinance, or the Fairfax County Comprehensive Plan for Petitioner's assertion that the BZA is required to follow Planning Commission recommendations in special permit proceedings. Rather, the Virginia Code imparts authority on these matters to the BZA. See Va. Code § 15.2-2309(6) ("Boards of zoning appeals shall have the following powers and duties . . . To hear and decide applications for special exceptions as may be authorized in the

ordinance. The board may impose such conditions relating to the use for which a permit is granted as it may deem necessary in the public interest, including limiting the duration of a permit, and may require a guarantee or bond to ensure that the conditions imposed are being and will continue to be complied with."). Nor does Article 8 of the Ordinance require the BZA to adopt a recommendation from the Planning Commission.

Petitioner cites Va. Code § 15.2-2232(B) as support for its assertion that the BZA must follow the Planning Commission's recommendation, stating that this provision allows the Board of Supervisors to overrule the Planning Commission's determination by a majority vote, but does not provide the BZA the same authority. This argument is also unpersuasive. Local planning commissions serve "primarily in an advisory capacity" to governing bodies. See § 15.2-2210. Given this statutory framework, the fact that a Board of Supervisors may overrule the Planning Commission is not surprising, nor does it suggest that the BZA may not come to a different decision than the Planning Commission.

Third, Petitioner argues that the BZA improperly relied on irrelevant facts outside the record by referring to previous unsuccessful attempts by other telecommunications carriers to locate a telecommunications facility on the Parklawn property. Petitioner contends that § 8-006 does not direct the BZA to consider past applications and that the BZA has a duty to consider the individual application before it. While the Court agrees that the BZA's duty is to consider the special permit application before it, the Court does not find the BZA's reference to past applications to constitute a sufficient ground for reversal. First, the BZA did not state that it was denying the application, even in part, based on past unsuccessful attempts. Rather, the BZA merely stated that past unsuccessful applications "should give us all pause." Second, the Court finds that the BZA based its decision on numerous other factors and types of evidence which, as explained below, the Court finds sufficient to justify its decision.

Petitioner also points to the BZA's statement that it had approved monopoles in other locations where visual impact was mitigated by placing the pole in a flagpole, a cross, a church steeple, or in an area surrounded by pine trees, but that "none of those mitigation techniques can or have been used in this case." Petitioner contends that the BZA's assertion that no mitigation techniques were proposed is plain error because AT&T proposed a graduated paint monopole, a monopine, and a stealth design. The Court does not find this argument compelling for the following reasons: First, the BZA at no point asserted that "no mitigation techniques were proposed." Rather, the BZA listed several mitigation techniques that had been successful in other locations and noted that those specific mitigation techniques had not been proposed in this case. Additionally, although the Petitioner proposed a monopine, Parklawn is in an area with primarily deciduous trees, not pine trees as in the BZA's example. Second, while Petitioner is correct that the

Ordinance does not require specific mitigation techniques or stealth designs, the Comprehensive Plan includes numerous provisions related to mitigation of visual impacts. See Comprehensive Plan, Objective 42, Policies c, j, k, l; Objective 43, Policies a, b, c. Third, the BZA did not find that specific mitigation techniques were required for a telecommunications facility; it simply provided examples of successful mitigation on other sites and indicated that the mitigation in this case was not sufficient to demonstrate that "the proposed use will be in harmony with the general purpose and intent of applicable zoning district regulations." The fact that the BZA found that AT&T's proposed facility was not harmonious and based this conclusion in part on the type of mitigation techniques proposed does not demonstrate that the BZA applied erroneous principles of law. In fact, the BZA was required under the Comprehensive Plan to evaluate the mitigation techniques proposed by AT&T and to make a factual determination on this issue based on the evidence presented.

Petitioner also takes issue with the BZA's statement regarding the distance, 226 feet, between the proposed tower and the nearest residence. Petitioner argues that the BZA's consideration of this fact is erroneous and follows no principle of law because the Ordinance does not contain a requirement for setback distance from offsite residences. The Court finds no indication in the record that the BZA required a specific distance between a residence and the proposed facility or considered the setback distance from a residence to constitute a "principle of law" upon which it must base its decision. Rather, this statement was made under the BZA's "findings of fact," and is just one of the facts that the BZA considered in evaluating whether the proposed facility met the § 8-006 standards. Section 8-006(3) requires the BZA to consider whether a proposed facility is harmonious with the neighboring properties and, specifically, to ensure that the location, size, and height of structures will not hinder or discourage appropriate development. In light of this requirement, it was certainly relevant, if not necessary, for the BZA to consider the distance between a 128-foot monopole and residential property. Furthermore, the Comprehensive Plan does mandate a 200-foot setback between a monopole and any existing residence. See Plan, Objective 44, Policy d. While AT&T clearly complied with this requirement by placing the pole 226 feet from the nearest residence, this does not mean that the BZA could not consider the distance in its decision.

Finally, Petitioner maintains that the BZA relied on an erroneous principle of law by concluding that "there are other technologies available . . . and they were never presented to the Board." The Comprehensive Plan specifically states that micro-cell technologies or similar miniaturization technologies, such as DAS, should be considered when constructing a new structure in a residential neighborhood. See Comprehensive Plan, Objective 42, Policy c. As the BZA is required to evaluate an application in accordance with

the Comprehensive Plan, it was authorized to consider the use of alternate technologies in its decision.

In accordance with the above analysis, the Court finds that the BZA did not apply erroneous principles of law in its decision to deny AT&T's special permit application.

## B. *The "Plainly Wrong and in Violation of the Purpose and Intent of the Zoning Ordinance" Standard*

The standard of review governing the BZA's factual determinations is whether the BZA's decision was plainly wrong and in violation of the purpose and intent of the zoning ordinance. Petitioner first argues that the BZA's finding that AT&T's application did not meet Standard 3 of § 8-006 was plainly wrong in light of the BZA's findings related to property values. Petitioner notes that the Thorne Study demonstrated that there would be no negative impact on the value of the surrounding properties and contends that the BZA "simply ignored" specific points of relevant information provided in the Study. These points relate to the utilization of the Fairfax County Assessment website, a table predicting median sales prices in Parklawn, the twelve impact studies Thorne has conducted, and a site-by-site inspection of eleven existing treepoles in Fairfax County. Petitioner contends that the BZA improperly substituted its own opinion for Thorne's and did so without any evidentiary support because "the application's opposition offered absolutely no evidence to counter Oakleigh Thorne's findings."

The Court finds Petitioner's assertion that the opposition offered no evidence to counter the Thorne Study to be without merit. Numerous local residents asserted that they would not have purchased their homes had they known a monopole would be constructed nearby; there was a statement from one resident who stated that he had placed his house up for sale because of the proposed monopole; and there were statements from residents concerned about decreased property values. In *Alleghany*, evidence presented to the BZA in opposition to petitioner's variance application included resident testimony that the proposed use would depreciate the value of their properties. 217 Va. at 68 (holding that there was credible evidence upon which the Board could justify its denial of a variance). In addition to letters and testimony on the topic, multiple memoranda in opposition to the Application cited statements by members of zoning boards or committees, journal studies which assert that monopoles have negative impacts on property values, and other material. Finally, the opposition provided a letter from a Northern Virginia realtor who provided her professional opinion on the negative impact the proposed cell tower would have on property values in the proposed location.

Since the BZA was presented with evidence on both sides and, most importantly, experts on both sides, it was entitled to weigh the evidence and draw conclusions based on that evidence. See *Fowler*, 201 Va. at 948

(citation omitted) ("There is a prima facie presumption that the power and discretion of the Board of Zoning Appeals have been properly exercised, and its decision may not be disturbed unless it 'appears from the record transmitted to the court, together with any additional evidence taken . . . that the Board is plainly wrong'."). It is not the duty of this Court to substitute its judgment for that of the BZA. The Court may only overturn a decision that is "plainly wrong." See *Fowler*, 201 Va. at 948-49 ("We are of the opinion that the lower court erred when it ignored the well-reasoned findings of the Board of Zoning Appeals and substituted its own independent judgment for that of the Board."); see also *Alleghany*, 217 Va. at 69 ("The evidence adduced by Alleghany tended to show that the residential zoning of the subject parcel was unreasonable and that a commercial zoning would be reasonable. But that is not the question before us. We cannot say as a matter of law that there was no credible evidence on which the Board could justify its denial of the variance. Nor can we say as a matter of law that the ruling of the trial court, based upon the evidence presented to the Board, the evidence taken in the trial court, and the view taken by the trial court, was plainly wrong."); *McGhee v. Board of Zoning Appeals of Roanoke*, 57 Va. Cir. 47, 68 (2001) ("[The BZA was] entitled to weigh the submissions made to them, and to base their decisions on the considered judgments about the weight and effect of the evidence and arguments.").

Moreover, there is no evidence that the BZA disregarded the Thorne Study or made unreasonable findings based on the evidence before it. In fact, the BZA specifically addressed the Thorne study in its written decision, stated that it agreed with some of Thorne's findings, and indicated why it disagreed with certain other conclusions. The BZA justified its finding that the monopole would negatively affect home value through its "simpler test" and its determination that the presence of a monopole would require a homeowner to reduce the sale price of a property or keep a property on the market for a longer time.

The "simpler test" was described by the BZA as follows: "[A] simpler test would be viewing two homes of exactly the same value, with exactly the same access to good schools, and exactly the same access to the same transportation and having the opportunity to buy one without a monopole that is 128 feet tall that is in the backyard or one that does not have a monopole and has open vistas, which home would be purchased? The home without the monopole."

These conclusions could reasonably be based on the letter from Mary L. Daniel, who provided her professional opinion as a local realtor, and citizen letters and testimony expressing that many residents would not have purchased their homes if they had known that a monopole would be constructed.

Similar evidence has previously been found sufficient to support a BZA's decision. See *National Memorial Park*, 232 Va. at 92-93 (finding that the evidence presented to the BZA, which included testimony from residents of

the neighboring community and a real estate broker familiar with the area who stated the proposed use would adversely affect property values, was sufficient to support the BZA's decision even though the evidence in the case was conflicting); *Gittins v. Board of Zoning Appeals*, 55 Va. Cir. 495, 497 (2000) (finding that a neighbor's testimony that the petitioner's use was an "eyesore" and a realtor's statement that the existence of the structure would affect the marketability of the neighbor's home were "fatal" to petitioner's application for a special use permit).

Thus, the Court finds that there was credible evidentiary support for the BZA's conclusion regarding property values, and its findings on this matter were not plainly wrong or in violation of the purpose and intent of the zoning ordinance.

The Court finds that the BZA's findings on property values are in accord with the Ordinance because § 8-006(3) directs the BZA to ensure that a proposed facility will not hinder or discourage the appropriate development and use of nearby properties.

Petitioner also argues that the BZA's decision was plainly wrong because it disregarded information and evidence in the record regarding AT&T's stealth designs, considerations of and reasons for rejecting alternative sites, and well-documented community support for the facility. However, the opposition provided conflicting evidence on visual impact, the efficacy of AT&T's proposed mitigation, alternative sites, and community opposition. Again, the BZA's decision is presumed to be correct and should not be overturned unless there is "no credible evidence" upon which it was based. *Alleghany*, 217 Va. at 69. While AT&T presented evidence that the visual impact of the monopole would be "reasonably mitigated," the opposition presented evidence that many homes would be negatively affected by the visual impact of the monopole, due in part to the topography of the location. This evidence included photographs from areas inside residents' homes, as well as letters and testimony stating that the monopole would destroy the aesthetic value of the local environment, disrupt residents' enjoyment of surrounding nature trails, negatively impact residents' quality of live, and spoil the view from many homes.

Other courts have considered testimony on the aesthetic impact of a proposed use. See *Alleghany*, 217 Va. at 68 ("The evidence of those opposing the application consisted of testimony of several residents . . . that use of the property for a camper and used car sales lot in close proximity to their homes would be unsightly."); *Gittins*, 55 Va. Cir. at 497 (finding that a neighbor's testimony that the petitioner's use was an "eyesore" and a realtor's statement that the existence of the structure would affect the marketability of the neighbor's home were "fatal" to petitioner's application for a special use permit).

That the BZA found the topographical concerns relevant and significant is apparent from statements made by BZA members Hart, Beard, and Smith regarding the "stadium effect" of the location.

BZA member Smith based his opinion regarding topographical concerns on a site visit that he made himself. The Virginia Supreme Court has held that zoning boards can rely on site visits and the personal knowledge of their members in reaching their decision. See *Board of Zoning Appeals v. Fowler*, 201 Va. 942, 948, 114 S.E.2d 753 (1960) (citation omitted) ("A zoning board in passing on an application for a variance, may view the locality and may also give consideration to matters within the personal knowledge of its members in arriving at a decision.").

Furthermore, the BZA found that many community members opposed the facility, a conclusion that could reasonably be based on the fact that the petition in opposition was signed by at least 177 individuals by the time it was presented to the BZA. Thus, the opposition presented much evidence upon which the BZA could choose to rely in denying AT&T's application. The mere fact that the BZA decided against AT&T does not mean that the BZA disregarded AT&T's evidence.

Regarding Standard 2, Petitioner suggests that the BZA ignored AT&T's mitigation efforts. But all the BZA said was that AT&T had not used certain specific mitigation techniques, such as placing the monopole in a flagpole, a cross, a church steeple, or in an area surrounded by pine trees, which the BZA had found successful in other locations. And the Court could find no evidence in the record that AT&T proposed to mitigate its facility by placing it in a flagpole, a cross, a church steeple, or amongst pine trees.

There is significant evidence in the record that the trees in the proposed location were deciduous. While AT&T proposed to add additional trees to the area, including several evergreens, there was no indication that all of these trees would be pine trees.

Moreover, the Court did find evidence in the record regarding the negative visual impact on numerous properties, the inability to mitigate the impact for several of those properties, and the topographical concerns with the proposed location. Thus, the BZA had credible evidence from which it could support its conclusion that AT&T's proposed mitigation techniques were not enough to demonstrate that the facility was in harmony with a residentially-zoned area.

Petitioner also contends that the BZA's decision was plainly wrong because the BZA failed to acknowledge or make reference to testimony and evidence presented by community members in support of the proposed facility and failed to balance the petition in opposition with the petition in support of the facility, which contained 200 signatures. While Petitioner correctly states that some community members testified and wrote letters in support of AT&T's application, there were also individuals that testified in opposition to the application, and the petition in opposition was signed

by 177 individuals. Additionally, the opposition asserted that 70% of Parklawn members did not live in neighborhoods that would be affected by the monopole. The Court notes that this statistic is uncorroborated by anything other than resident letters and testimony. The mere fact that the BZA did not discuss community support for the monopole in its written decision does not demonstrate that it ignored community support of the application; rather, the BZA simply chose to lend more credence to community opposition and to reference this opposition in its written decision. In *Alleghany*, evidence presented to the BZA in opposition to petitioner's variance application included a petition signed by more than fifty residents of a nearby subdivision. 217 Va. at 68.

Additionally, Petitioner asserts that the BZA committed plain error by making the "unsubstantiated and unproven claim" that the monopole would extend 50 to 75 feet above the tree line and dismissing AT&T's stealth design options and tree preservation and maintenance plan. The Court does not find the BZA's finding regarding the height of the monopole to be unsubstantiated because Staff reported at the July 17, 2013, hearing that the monopole "would stand approximately 60 feet above the existing canopy." R. at 1398. The Court finds it immaterial that the BZA used the phrase "50 to 75 feet," rather than 60 feet. As the Staff extensively investigated AT&T's application and requested maps and projections of the monopole, the Court finds that the BZA was entitled to deem its findings to be credible. Additionally, the fact that the BZA did not mention AT&T's stealth design or tree plan in its written decision does not demonstrate it did not consider those aspects of AT&T's application; it merely indicates that the BZA did not find these mitigation techniques sufficient to justify granting the application.

Furthermore, Petitioner asserts that the BZA was incorrect in its conclusion that it was "never apprised of the reasons other techniques were not employed or other locations whereby the applicants' coverage concerns could be met fully and would truly mitigate the effects of the equipment used." Petitioner maintains that it did present this information to the BZA through its propagation maps, which demonstrated coverage gaps would not be filled at alternative sites. Additionally, it asserts that it did address Distributed Antenna Systems ("DAS") and refuted assertions that DAS could be a replacement for the proposed facility.

As to the alternative location issue, this Court finds that the BZA simply found AT&T's submission to be inadequate and was not satisfied that Parklawn was the only solution. The BZA had evidentiary support for this conclusion, and, therefore, its finding on alternative sites was not plainly wrong.

Although AT&T asserts that it addressed DAS technology and refuted its effectiveness in this case, the Court was only able to find one instance in the record where AT&T discussed DAS, and that instance was not before the BZA.

AT&T's Petition states that this was discussed at the special exception hearing. This hearing is not part of the record in this case, and the Board of Supervisors' decision is not before the Court. There is also a memorandum in opposition to AT&T's application that cites a YouTube video in which AT&T responded to a question at a community meeting about DAS technologies. R. at 1242. AT&T stated that it was not proposing other technologies, opting instead for mitigation with the stealth design. R. at 1242.

The Court did not find evidence in the Staff Report, AT&T's application or Revised Justification, the July 17, 2013, hearing before the BZA, or the slideshow presented to the BZA (and provided to the Court) to indicate that AT&T presented information on alternative technologies, such as DAS or other microcell technologies, to the BZA.

The Court only refers here to materials that were actually composed by AT&T or presented by AT&T to the BZA. AT&T was the applicant in this case, and the BZA's statement on this matter was clearly referring to AT&T's failure to apprise the BZA of alternative technologies.

These materials only explained AT&T's choice to use a stealth design and a graduated paint monopole or monopine. Additionally, a citizen who testified at the July 17th hearing raised the issue of DAS technologies, and AT&T did not respond to these statements. R. at 1411. As the Court was unable to find instances in the record where AT&T addressed alternative technologies to the BZA, the BZA's finding on this matter was not plainly wrong.

Finally, even if the Court had found that one of the BZA's decisions on a specific factual category was "plainly wrong," there were many other factors on which the BZA based its decision. According to § 8-006, the BZA need only conclude that a use is not "harmonious" with the Ordinance, Comprehensive Plan, or neighboring properties in order to deny an application for a special permit. In this case, the BZA's written decision demonstrates that it based its denial of AT&T's application on the visual impact of the monopole, the failure of proposed mitigation to eliminate the negative impact for numerous properties, the lack of briefing on alternative technologies, the negative impact of the monopole on home values, the possibility of alternative sites, and community opinions against the construction of the facility. As stated above, the Court finds that there was credible evidentiary support in the record to support the BZA's findings of fact regarding these factors. If the BZA had concluded that the proposed use was not harmonious based on just one of these factors, it might have been enough to affirm its decision under the plainly wrong standard. The fact that the BZA enumerated several factors as bases for its decision and was presented with credible evidence for each of these factors compels the Court's conclusion that the BZA's decision to deny AT&T's application based on Standards 1, 2, and 3 of § 8-006 was not plainly wrong and in violation of the purpose and intent of the zoning ordinance.

## C. *Arbitrary, Capricious, and Unreasonable*

An additional standard of review governing the BZA's decision is whether the BZA's decision was arbitrary, capricious, and unreasonable. The presumption of legislative validity that applies to the BZA's decision is a presumption of reasonableness. *Robertson*, 266 Va. at 532. Even if that presumption is rebutted by probative evidence of unreasonableness, the Court must still affirm the BZA's decision if the matter at issue is "fairly debatable," that is, if "the evidence offered in support of the opposing views would lead objective and reasonable persons to different conclusions." *Id.*, (citation omitted); *Lerner*, 221 Va. at 34.

Petitioner argues that the BZA's decision was arbitrary, capricious, and unreasonable because it has previously approved other proposed telecommunications facilities in similar locations that had "less favorable conditions," such as smaller parcels and a location in a more restrictive zone. The Petition lists eight sites that were presented to the BZA as examples of similar sites in which a facility had been approved (the characteristics of these sites are explained in detail above in Section C.2), Holmes Run Acres Recreation Association, Commonwealth Swim Club, West Springfield Village Swim Club, Broyhill Crest Recreation Club, Lord of Life Lutheran Church, Calvary Korean Baptist Church, Sydenstricker United Methodist Church, and Sleepy Hollow United Methodist Church. In addition to the less favorable conditions on these sites, AT&T maintains that its proposal surpassed all of these other sites because of the split design, stealth design, existing vegetation, topography, and size of the parcel in this case. Furthermore, AT&T notes that it made revisions (i.e., the submission of two designs, the elimination of extra parking spaces, and the proposed plantings) to the original design that made the proposal harmonious with the surrounding neighborhood.

This argument, however, is made in a vacuum and does not give proper weight to the presumption of legislative validity. The presumption of reasonableness can be rebutted only through probative evidence of unreasonableness. Comparing the instant matter to other BZA decisions does not necessarily demonstrate unreasonableness; in fact, AT&T itself argues that "it is the Board's duty to consider the individual application before it." See Pet. 15; see also *Board of Supervisors v. McDonald's Corp.*, 261 Va. 583, 591, 544 S.E.2d 334 (2001) (holding that the trial court erred in finding the Board's decision inconsistent and discriminatory because it incorrectly concluded that the Petitioner's proposal and a previously approved proposal on another property were similarly situated); accord *Covel v. Town of Vienna*, 78 Va. Cir. 190, 222 (2010) ("Petitioners cite no Virginia law which would support a conclusion that lack of total uniformity of opinions of personnel of a locality on general issues relating to enforcement of an historic district can constitute sufficient 'probative

evidence of unreasonableness' concerning specific decisions made on other occasions to satisfy a landowner's burden to produce such evidence.").

Furthermore, the intricate details of the applications in these other cases, the hearings before the BZA in these other cases, the evidence presented to the BZA in these other cases, and the BZA's analysis in these other cases is not before the Court. Although the sites listed by AT&T may have included similarly sized monopoles in residentially zoned areas, there are clearly many factors that go into a BZA decision on a matter of this nature, including topography of the site, home values in the area, community opinions, and alternative technologies. There is simply no evidence before the Court from which it could conclude that the BZA faced the same or even a similar situation in those other contexts. See, e.g., BZA member Hart's explanation that the subject property was distinguishable from other sites, such as Broyhill Crest and Holmes Run Pool, because the topography of the Parklawn location made it impossible to conceal the facility in a way that would make it harmonious with the surrounding properties. R. at 1435. Additionally, there were resident statements that differentiated Parklawn from other locations based on topography and community opinions. R. at 1266, 1298. Thus, the Court holds that the Petitioner has failed to rebut the presumption of reasonableness in this case.

However, even if the Petitioner had rebutted the presumption of reasonableness that attaches to the BZA's determination, the Court would nonetheless find that the issue was "fairly debatable" because there was sufficient "evidence offered in support of the opposing views [that] would lead objective and reasonable persons to different conclusions." The essence of the BZA's determination in this case was that the proposed use was not harmonious with the surrounding area. The evidence presented in support of this conclusion included, but was not limited to, the following: the monopole would stand sixty feet above the existing tree line; the hilly topography of the location would maximize the negative visual impact on surrounding properties; the photos taken by residents from inside their homes demonstrated a negative visual impact; the monopole would be on the edge of the Parklawn parcel (due to the resource protection area and floodplain) and would be only 226 feet from the nearest residence; an expert opinion from a realtor asserted that there would be a decrease in property values if the monopole was constructed; many residents stated they would not have purchased their home had they known a facility of this size would be constructed; many community members spoke against the proposal; alternative technologies were not adequately considered; and alternative sites were not adequately explored. (BZA member Hart addressed the BZA's approval of other similar sites, such as Holmes Run Pool and Broyhill Crest, and distinguished those sites primarily on the topography of the Parklawn location and the consequent inability to conceal the facility. R. at 1435.) In light of the quantity of evidence presented to the

BZA, which was significant, and the quality of evidence presented to the BZA, which included photographs, journal articles, community opinions, statements from Staff, statements from a real estate expert, and a myriad of other material, the Court concludes that the evidence available to the BZA was enough to lead objective and reasonable persons to different conclusions as to whether the proposed use was harmonious with the Ordinance, Comprehensive Plan, and surrounding properties.

Other Virginia courts have reached the same conclusion when faced with similar evidentiary support in the record. See, e.g., *Robertson*, 266 Va. at 537 ("The relevant question, however, was 'not who presented the greatest number of expert witnesses or even who won the battle of the experts,' but rather 'whether there [was] any evidence in the record sufficiently probative to make a fairly debatable issue of the . . . decision to deny [the landowner] a special use permit'.") (quoting *Board of Supervisors v. Stickley*, 263 Va. 1, 11, 556 S.E.2d 748 (2002)); *McDonald's Corp.*, 261 Va. at 591-92; *National Memorial Park*, 232 Va. at 92-93 (finding that the evidence presented to the BZA, which included testimony from residents of the neighboring community and a real estate broker familiar with the area who stated the proposed use would adversely affect property values, was sufficient to support its decision even though evidence in the case was conflicting); *Fowler*, 201 Va. at 948 (1960) (affirming the BZA's decision to grant a variance based on expert testimony and site visits by the BZA); see also *Board of Supervisors v. Southland Corp.*, 224 Va. 514, 524, 297 S.E.2d 718 (1982) ("We shall not undertake to resolve the controversy posed by the foregoing arguments because they demonstrate that the question whether quick-service food stores should be required to obtain a special exception is 'fairly debatable'."); *Gittins*, 55 Va. Cir. at 497 ("[T]he Board is not required to produce evidence sufficient to persuade the finder of fact that its actions are reasonable by a preponderance of the evidence.").

The "fairly debatable" standard is used in other contexts as well. There is a line of cases that discusses the denial of conditional use permits even when the proposed use would be appropriate under the relevant ordinance. See *County Board of Arlington County v. Bratic*, 237 Va. 221, 229 (1989) (affirming the Board's decision to deny a conditional use permit because both the use permitted by right and the proposed use were appropriate for the lot in question, thus making the issue "fairly debatable") (citing *Board of Supervisors v. Jackson*, 221 Va. 328, 335, 269 S.E.2d 381 (1980) ("When, as here, the underlying zoning and the new zoning are both appropriate for the lot in question, a classic case of a 'fairly debatable' issue is presented.")); see also *Cowardin*, 239 Va. at 526 (affirming the BZA's decision to deny a boathouse use permit where there was evidence that demonstrated no other boathouses were located in the area and the proposed use would have had an adverse effect on local waters). Thus, the issue was "fairly debatable."

Finally, AT&T argues that there is no "universally-applied rule of law" governing when a parcel with an existing special permit must file a special permit application with the BZA. The Court disagrees. Section 2-303 of the Ordinance specifically states that "[n]o use of a structure or land that is designated as a special permit use . . . shall hereafter be changed to another use that is designated as a special permit use in such district unless a special permit has been approved by the BZA and the use has been established in accordance with the provisions of Article 8."

Technically, the construction of a telecommunications facility is a special exception use. See Ordinance § 9-101. However, since Parklawn was already an existing special permit use, it was required to seek BZA approval to make any substantial changes to its existing use. See Ordinance § 8-004 ("Once established, the use shall be conducted in substantial conformance with the permit, any conditions or restrictions imposed by the BZA, and all other requirements of this Ordinance. Except as may be permitted under Paragraphs 3 and 4 below [modifications for accessibility or minor modifications], no use shall be enlarged, expanded, increased in intensity or relocated and no condition of the special permit shall be modified unless an application is made and approved for an amendment to the special permit in accordance with Sect. 014 below or a new special permit is approved.") (emphasis added).

This clearly establishes that AT&T and Parklawn were required to seek BZA approval to amend Parklawn's special permit use to allow for the construction of a telecommunications facility.

*Conclusion*

For the foregoing reasons, the Board of Zoning Appeals decision denying the application of New Cingular Wireless PCS, L.L.C., and the Parklawn Recreation Association for an Amendment to Special Permit 76-M-088 is affirmed.